STANLEY GALLAGHER, a Minor, by Harry Gallagher, His Guardian ad Litem, Respondent, v. L. H. KERMOTT and St. Joseph's Hospital, a Corporation, and L. H. KERMOTT, Appellant.

(216 N. W. 569.)

**Physicians and surgeons — where defendant's acts or omissions may be consistent or inconsistent with proper practice, burden is on plaintiff to establish negligence.**

1. In an action for damages for malpractice, where the plaintiff claimed to have lost his leg as a result of negligence of the defendant in treating an injured

Annotation.—(1) Proof necessary to discharge the burden resting upon plaintiff, in action against physician for malpractice, to show that negligence or unskilfulness of the physician caused or contributed to the death or injury of the patient, see annotation in 15 L.R.A.(N.S.) 416.

foot, it is held that, where the defendant's acts or omissions may be either consistent or inconsistent with proper practice, the burden is on the plaintiff to establish by competent expert testimony the negligence alleged.

**Physicians and surgeons — res ipsa loquitur does not apply in malpractice case.**

2. The doctrine of res ipsa loquitur has no application in a malpractice case and an unfortunate or bad result does not supply proof of negligence.

**Physicians and surgeons — evidence of negligence being matter of speculation, insufficient to support verdict for plaintiff.**

3. Where the evidence is such that the inference of negligence is purely a matter of speculation, it is insufficient to support a verdict.

**Evidence — in instant case evidence insufficient to support verdict.**

4. The evidence is examined and, for reason stated in the opinion, held to be insufficient.

Opinion filed December 12, 1927.

Negligence, 29 Cyc. p. 623 n. 99. Physicians and Surgeons, 30 Cyc. p. 1584 n. 48, 49; p. 1587 n. 78.

Appeal from the District Court of Ward County, *Lowe,* J.

Reversed and new trial granted.

*L. J. Palda, Jr., C. E. Brace, Robert W. Palda,* and *E. R. Sinkler,* for appellant.

"A physician is not negligent in ordering the patient's attendant to keep her warm by placing hot irons in her bed, so as to render him liable in case the patient is burned by the negligent use of the iron." Milkowski v. Graham, 169 Wis. 398; 4 A.L.R. 1524, 172 N. W. 785.

"An employee of a patient who has just undergone an operation does not become the servant of the physician so as to render him liable for negligence, merely because he tells her to place a hot iron at the patient's feet." Ibid.

"Upon questions involving a highly specialized art, with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence; and when there is no such evidence to support an allegation depending upon such a question, there is nothing to justify submitting the issue to the jury." Ewing v. Goode (C. C.) 78 Fed. 443.

"What is proper and usual practice in examining and treating an injury, and what constitutes ordinary care by a physician, can only be shown by expert testimony." McGraw v. Kerr, 23 Colo. App. 163, 128 Pac. 870.

"When the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury." Ewing v. Goode (C. C.) 78 Fed. 442.

*H. L. Halvorson,* for respondent.

Where a physician remains away longer than he agreed to, or fails to come as agreed, and injury results from lack of treatment during that time, the physician is liable for malpractice. Gerken v. Plimpton, 62 App. Div. 35, 70 N. Y. Supp. 793; Hood v. Moffett (Miss.) L.R.A.1916B, 622, 69 So. 664.

"Negligence consists in conduct which common experience or special knowledge of the actor knows to be likely to produce the result complained of, under the circumstances known to the actor, that he is held answerable for that result, although it was not certain, intended or foreseen." Schlemmer v. Buffalo, R. & P. R. Co. 205 U. S. 1, 51 L. ed. 681.

BIRDZELL, Ch. J. Plaintiff sued for alleged negligence in the care of and treatment for an injury to his foot. The action was dismissed as to the defendant St. Joseph's Hospital Association and judgment was rendered in favor of the plaintiff against the defendant Kermott, a physician, upon a verdict of a jury. A motion was made for judgment non obstante. The appeal is from the judgment and from the order denying the defendant's motion. Ignoring allegations of negligence against the hospital as a defendant, the amended complaint charges the remaining defendant with inducing the father of the plaintiff to consent to the removal of the plaintiff from Trinity Hospital in Minot to St. Joseph's Hospital, the defendant agreeing that he would immediately repair to the hospital and give the plaintiff care and attention "but that contrary thereto, he failed and neglected to appear at said hospital or to give said plaintiff any care or attention,

or to examine his said injury or to give any orders with respect thereto, except that he ordered and directed the said St. Joseph's Hospital, by and through his agents and employees, to place a tourniquet upon the plaintiff's leg at the knee or about at the knee in order to stop the flow of blood of said injury. That in truth and in fact at that time the said injury was bleeding only slightly and that no tourniquet, according to this plaintiff's best knowledge, information and belief, was necessary or expedient or required." That pursuant to the orders of the defendant, the hospital, through its employees and agents, caused a tourniquet to be adjusted upon the leg of the plaintiff from 12 o'clock midnight until the next forenoon; that frequently during the night the hospital, through its agents and employees, was advised that the plaintiff was in severe pain by reason of the tourniquet but that the same was not removed and that "by the said tourniquet, the blood supply to that portion of the boy's (plaintiff's) limb below the said tourniquet, had been shut off to such an extent that that portion of said leg was, in common parlance, and as a matter of fact, dead." That by reason of the shutting off of the blood supply through the failure of the defendant to care for or protect the foot against infection a septic condition arose; that the defendant did not advise the plaintiff or his father of the fact that the blood supply had been shut off, nor of the septic condition which had arisen but that he did proceed to amputate the great toe, which operation he advised as necessary; that he thereafter advised that there was infection present which necessitated the amputation of the foot, which operation the defendant proceeded to perform; that some time thereafter while the plaintiff was under the care of the defendant "the said plaintiff's leg being gangrenous, the said leg amputated itself and broke or dropped off just below the knee. . . . That thereupon the plaintiff was advised through his said father, by the said defendant L. H. Kermott, that another operation would have to take place immediately or that otherwise the plaintiff would surely die." That while the plaintiff was being cared for by the defendant he was "so negligent and careless, and did carelessly and negligently and through want of due care, permit infection to develop in said injury and through the tourniquet placed on said leg by order of the defendant L. H. Kermott by the defendant St. Joseph's Hospital and which said tourniquet was

left upon said leg for an unreasonable length of time, and for such length of time as caused said member to become dead and in consequence thereof, a septic condition ensued and gangrene set in, resulting and necessitating the amputation of said leg and the disease of of the thigh-bone, which is still in a diseased condition, and the said diseased thigh-bone and the necessity of amputation of said leg, at or near the thigh, was caused by the negligent and careless acts of these defendants."

On the evening of December 9, 1924, the plaintiff, a boy of fourteen years of age, received an injury while crossing a railroad track in Tagus, which was temporarily blocked by a train (see Gallagher v. Great Northern R. Co. 55 N. D. 211, 212 N. W. 839), his right foot being caught between the bumpers of two cars or between a bumper and a car. After sustaining the injury the plaintiff was taken about fifty yards to a hotel in Tagus, where he received first aid which consisted in wrapping the foot with medicated cotton and cloth. He was taken to Minot in a Ford sedan and arrived at Trinity Hospital between 10:00 and 10:30 o'clock P. M. Meanwhile the defendant Kermott had been notified that the plaintiff was coming and had made arrangements to enter him in St. Joseph's Hospital. The defendant, however, was called to Trinity Hospital about 11 o'clock, where he saw the plaintiff, saw the injured member and gave some instructions for his care. The evidence is in dispute as to any treatment given by the defendant at that time, as will later appear, but the injured member was bandaged at Trinity Hospital. The defendant and the plaintiff's father left the hospital together and, as a result of discussion of the hospital arrangements in which comparative X-ray facilities of the two hospitals entered to some extent, the plaintiff's father returned to Trinity Hospital and caused the plaintiff to be removed to St. Joseph's Hospital, which institution he entered at about 12:30 o'clock, A. M., December 10, 1924. Directions were given by the defendant to the nurse or nurses in charge to apply a tourniquet, if necessary, and a tourniquet was applied. The manner of applying and the length of time it remained tight is involved in serious dispute in the record. It was completely removed, whether from a tightly clamped position or a slackened position, at about 7:00 or 7:30 o'clock in the morning. X-ray pictures of the injured member were taken that

morning (the 10th) and the plaintiff was taken, at about 11 o'clock, from the X-ray room to the operating room where, after a general anæsthetic was administered, his wounds were examined by the defendant and another physician. After consulting the plaintiff's father, the defendant removed the great toe and otherwise dressed the plaintiff's wounds. The X-ray pictures disclosed no broken bones but the great toe was dislocated to such an extent that the bones were exposed. The evidence is in conflict as to the extent of the other injuries but it clearly shows an open wound, whether deep or somewhat superficial is in dispute, on the instep and further abrasions on the under side of the foot. On the following day, unmistakable symptoms of gangrene being present, the defendant notified the plaintiff's mother of the necessity for amputation of the foot, and, after consulting the plaintiff's father, the foot was amputated that afternoon. The gangrenous condition continued and some days afterward the leg was amputated at the knee joint. The plaintiff maintains that the leg below the knee sloughed off as a result of the gangrene, but it is undisputed that surgical attention was given by the defendant at the time of severance. About the 12th of January the plaintiff was placed in the care of another physician and removed to Trinity Hospital. Other operations were performed both there and later at a hospital in Rochester, Minnesota. The plaintiff has lost his leg and his health is impaired.

There are numerous assignments of error, many of which it will be unnecessary for us to consider. The assignments that go most directly to the merits of the action are those which are concerned with the sufficiency of the evidence to support the verdict. It is contended that there is not sufficient evidence to establish any negligence on the part of the defendant. Construing the complaint liberally it would seem to charge negligence, consisting in the failure of the defendant to give prompt treatment to disinfect the wound and in causing a tourniquet to be unnecessarily and so improperly applied as to result in gangrene. These assignments cannot be properly considered, except in the light of a careful survey of the evidence bearing upon them. The transcript of the testimony covers approximately four hundred pages, and it is manifestly impossible to abstract all of it in an opinion. Of necessity, therefore, and at the risk of possible omis-

sions of important items of evidence, we shall set forth, in abstract form, the salient testimony.

The defendant, Kermott, being called for cross-examination under the statute, testified that he was called by one of the dispatchers of the Great Northern Railroad and told that a boy had been badly injured at Tagus and that he would be brought in about 11 o'clock. He called St. Joseph's Hospital and made arrangements for him to enter and waited in his office until he should hear from the hospital. At about 11 o'clock he was called by Trinity Hospital and told that the boy was there. He went to the hospital and, after making preparations, helped the nurse take off some of the bandages and remove the upper part of the stocking. The nurse went out and brought in a dressing basket in which there was tincture of iodine, iodoform gauze, balsam of Peru, etc.; from this he took some sterile dressings, cleaned the foot, washed the blood off, took forceps and picked out pieces of the stocking that had been ground into the wound and removed clots of blood; took a small sponge, poured alcohol on it and cleaned out the edges of the wound, after which he put on a lot of sterile antiseptic gauze and wrapped it around the foot many times. The only antiseptic he used that night was alcohol around the edges of the wound. "The foot was bleeding quite a lot." He could not examine it properly that night because the boy was in such a condition that he could not do it without an anæsthetic. His pulse was weak, he was cold from his trip coming down and his face was very pale from the loss of blood. It was impossible to give him an anæsthetic that night and to properly examine the foot. It would have been poor treatment to have given an anæsthetic for the purpose of disinfecting and examining his foot at that time, and it could not have been done without giving him an anæsthetic. His specific testimony on this point is:

"Ques. You say, doctor, when he was brought in here that night it would have been good practice to have disinfected his foot and examined it at that time? Ans. No, I say it would have been poor treatment to have given him an anæsthetic for that purpose, and it could not have been done without giving him an anæsthetic in the condition he was in. Ques. It would have been improper to have treated him at that time, to have given the foot an antiseptic treatment? Ans. Yes, sir, it would."

He left orders with the nurse to give hot drinks, keep the patient warm and give him morphine to relieve pain, and inquired if the hospital had an X-ray machine. He was informed that it had none. He and the plaintiff's father left the hospital together and went down town in the defendant's car. While they were going down town the defendant told the plaintiff's father about the need of X-ray pictures to determine definitely the condition of the foot. The father had heard him inquire for an X-ray machine at the hospital. Gallagher asked if they had an X-ray at the other hospital and suggested moving the boy to that hospital and said that that was where they intended to go in the first place, but he went to Trinity Hospital because a man with him had suggested that there were a lot of steps to climb at St. Joseph's. At the suggestion of Gallagher the defendant called the ambulance and Gallagher went to the hospital to assist in moving the plaintiff. The defendant called up St. Joseph's Hospital and told them what to do when he arrived. He next saw the plaintiff at about 8:30 in the morning. He also saw the X-ray pictures and saw the foot in the operating room later. There were no bones broken except a fracture at the end of the large toe. "It was a small piece of the bone broken off." He could move his toes. The great toe was dislocated. After the anæsthetic was administered and an examination made, it was ascertained that the tissues along the wall (ball?) of the foot were "entirely loose from the bottom of the foot, so much so that you could separate the tissues, . . . and you could look in there clean over to the other side of the foot. . . . You could see the bone of the foot. . . . Also the tissues were loosened on the top of the foot over the instep so that you could put your hand in underneath the tissues there. . . . It was impossible the night before to examine this foot properly at Trinity Hospital." They did not find anything peculiar about the foot in regard to the blood supply to the foot proper that morning or afternoon but to some of the tissues on top of the foot. The blood supply had been destroyed to part of the foot and to part of the tissues underneath the foot. This was caused by a "destruction of the tissues, crushing injury that the boy had received, simply the destroying and severing of blood vessels to these portions what I am talking about." He could not say he had noticed that there had been a tourniquet on the foot or leg. It was

not apparent. "I told the Sister to put one on if it was necessary.
. . . I told her that when I called up from my office and told her
that the patient was going over there. . . . I told her that the
boy's foot was bleeding a good deal, and what we had done to it at
Trinity Hospital. I had put a lot of sterile dressings on the foot
and that the foot was bleeding a good deal and if it continued to put
a lot more dressings on and bandage them on. I could not see any-
thing to indicate that the tourniquet had been put on." He did not
know how long the tourniquet had been left on. He told the Sister
to leave it on a few minutes if it was necessary. He did not order a
tourniquet at Trinity Hospital. He did not think it would be neces-
sary. (Referring to the time of the first operation.) "We put a
lot of iodine in and swabbed it out with iodine thoroughly and after
that we did this work, and then we bandaged the foot with sterile
gauze and had him returned to his bed." The toe was removed dur-
ing the operation. The next operation was the next day about 2:30
or 3 o'clock in the afternoon. "We found that gangrene had set in.
. . . Ordinarily we speak of gangrene as death of a part of a tissue.
The regular dictionary definition is death to a circumscribe—that is
portion of tissue." It "comes from a germ." A certain kind of gan-
grene would come from the shutting off of the blood supply long
enough. "The gangrene that we found there was due to gas bacilli,
what we call gas gangrene. It is a small germ that—a very short
germ, rather—it is about twice as long as it is thick. It has rounded
ends to it. No particular formation, it is not found in groups, it is
found singularly anywhere, and it is a very malignant form of gan-
grene as a usual thing. It is a very active germ. One of the most
dangerous germs that we have anything to do with in our work. . . .
There are several kinds of gas gangrene, but not that particular bug."
He determined it was gas bacilli "by the odor and by the cracking it
made around the edge of the foot. The foot, we could feel the pres-
sure—on pressure we could hear and feel this crackling just like tissue
paper. We could feel that in the tissue." On the 11th of December
this condition seemed to be particularly around the injured part of
the foot, around the edges of the wound. They amputated the foot,
taking off the lower third, measuring from the knee to the bottom of
the foot. The germ described as gas bacilli is of unknown origin. "It

is found usually in the alimentary canal in animals and men and naturally where you find any excretions of the alimentary canal such as in barns, toilets and places of that kind, and especially, particularly around barns and manure." It would have been all right to have treated the foot antiseptically immediately upon his being taken to the hospital "providing that it could have been done without more injury to the boy. My first thought was the boy's life rather than the foot." About two and a half weeks after the second operation he made a further amputation. The leg did not amputate itself. When he gave instructions for putting on the tourniquet he told the sister to put it on and leave it on a few minutes if it was necessary.

Doctor Cameron, who treated the plaintiff beginning in January, on being called as a witness for the plaintiff, testified: Gangrene "means death of the tissues." He further testified, in response to a long hypothetical question, in which application of the tourniquet, the gangrene and the operations were supposed, that he had no opinion as to what caused the gangrene. He testified that the tourniquet could be used both for the purpose of controlling hemorrhage, and for the purpose of increasing the blood supply at a given place. The following examination took place: "Q. Doctor, what in your opinion would be the result of placing a tourniquet around the leg just below the knee-cap at about 12:30 o'clock at night such as the tourniquet exhibits D and E, just tight enough to check the flow of blood to a wound in the foot which was bleeding at the time of its application, adjusting the tourniquet by releasing and tightening it again in about twenty or thirty minutes and repeating that action in about twenty or thirty minutes and leaving the tourniquet on until about seven A. M. the following morning, at which time the tourniquet was so tight it was embedded in the flesh of the leg, that portion of the leg below the tourniquet, that is from the knee to the foot feeling numb to the patient at the time the tourniquet is removed? . . . A. I would say such an application of a tourniquet might have varying effects. . . . Q. Well, will you tell us the different results that would be probable from such application of a tourniquet? . . . A. A tourniquet applied as you describe there would certainly be applied in a proper manner surgically speaking to check any hemorrhage that was threatening and also at the same time to furnish a sufficient blood sup-

ply to the part.   Q.  If it were applied as set forth in the hypothetical question I asked you and was so and remained so applied until seven o'clock in the morning would that be a proper use of the tourniquet in accordance with medical practice?   A.  It would be.   Q.  And in making that answer, do you construe the question asked you hypothetically to mean that the tourniquet was on with sufficient consistency during the entire night to check the flow of blood?   A.  At intervals as you described in your hypothetical question.   .   .   .   I understood that there were two or three intervals at least.   .   .   .   Q.  I will ask you in regard to the same hypothetical question if as a matter of fact, the tourniquet was on there tight enough to check the flow of blood in the morning at the time of its removal and had so remained on from approximately 12:20 the night before with the exception of having been loosened two or three times for a few minutes not in excess of three or four times, and then re-adjusted again the early part of the night, whether or not that would be the proper use of a tourniquet?   A.  Well, it could well be a proper use of the tourniquet, there are many factors which you have not mentioned there which enter into it."   Doctor Cameron could not tell from the condition he found at the time he took the patient to what cause the condition was attributable.

Dr. E. C. Stone, testifying for the plaintiff, stated if a tourniquet were applied for the purpose of regulating the flow of blood from a wound in the foot such as the plaintiff sustained, it would be proper to apply it just below the knee joint.   There would be no difference in the result between applying it there and applying it just above the ankle, except that it would shut off the blood supply between the ankle and the knee.   The witness could not give an opinion as to how long the blood supply to a leg from the knee down could be cut off without causing death of the leg or gangrene.   He did not think that "local death would result if a tourniquet were applied for a matter of less than an hour.   If the blood supply were cut off for two or three hours, it might or might not cause gangrene.   When asked "what in your opinion would be the shortest time in which a tourniquet could be applied, shutting off of blood with absolute safety where it could not cause death of the local member or gangrene," he answered, "That may be several hours and it may be a day before the gangrene may set

in. Q. Yes, but what I am asking you, doctor, how long can you apply the tourniquet with safety so as to not have that result, that is how long a time can a tourniquet be applied which shuts off the flow of blood to a member such as I describe, how long a time can the tourniquet be applied with safety that you won't have that result. A. You can apply it with safety for several hours without loosening it. Q. Well, how many hours? . . . A. I mean from one to two, three or four hours. . . . Q. You said it would be safe for a period of three hours or so, by that you mean shutting off completely the blood supply? A. I did. Q. What kind of an individual did you have in mind at the time you made your answer? A. In a young person you may apply from five to ten hours with safety, but in an old person with hardening of blood vessels you cannot apply it very long."

The above is the evidence adduced by the plaintiff that may be classed as expert testimony, the defendant offering none. There is conflicting evidence on the subject of the boy's condition at the time he came to the hospital, on the condition of the foot both with respect to the extent of the injury to the tissues and with respect to excessive flow of blood, in regard to the treatment given by the defendant at Trinity Hospital and to the application of the tourniquet at St. Joseph's Hospital, including both the place where it was applied and the length of time it was allowed to remain. There is a further dispute with reference to whether at the time the leg was amputated at the knee the lower portion had in fact sloughed off before the operation was performed. The state of the evidence on these matters is substantially as follows: The testimony of the plaintiff and of the witnesses called by him (other than the defendant) who observed the condition of the foot shortly after the injury, is to the effect that the injury to the tissues was apparently not as great as indicated by the defendant's testimony. The plaintiff's evidence likewise tends to show that the flow of blood from the wound was not so profuse as the defendant's evidence would indicate, although one or more of his witnesses testify to excessive bleeding. The evidence is irreconcilable on these subjects and, there being substantial testimony tending to support the version of the plaintiff, it will be assumed, for the purposes of this opinion only, that the jury was justified in finding and did find in his favor upon these matters.

More particular reference to the conflict regarding the application of the tourniquet and the treatment given by the defendant must be made. The defendant says that he treated the plaintiff's foot at Trinity Hospital in the manner indicated in the above abstract of his testimony. The plaintiff's father who was present at that time says that the defendant called for two nurses and directed them to wrap up the foot and give the patient a hypo and "let him go to sleep;" that he asked the defendant if that was all he was going to do for him and asked particularly if he was going to disinfect his foot but that the defendant said he did not need it, it was only a flesh wound. He said it had bled sufficiently that it would be safe until morning; that he (the defendant) didn't touch the boy's foot himself; that the two nurses wrapped the foot up; that the defendant told the witness not to worry about the boy, that he was all right; that the defendant persuaded him to transfer the boy to the other hospital; that after they took the plaintiff to St. Joseph's Hospital there was no blood on the bandage that had been recently put on his foot but that the nurses put a tourniquet on his leg just below the knee and gave him a hypo. In about twenty minutes after the tourniquet was applied the plaintiff complained to the witness that it was hurting him, whereupon he called the nurse. A sister and one nurse came in response to the call. He could not say whether they slackened the tourniquet or not; "they fussed with it just a few moments and were gone again. In a short time twenty or thirty minutes he cried again about his knee." The nurses again came back and "fussed with the tourniquet again; left the room and that went on until half past three o'clock in the morning, and they came in altogether five times and fussed with the tourniquet. I put on the headlight five times, and they came in five times and fussed with the tourniquet after that and he went to sleep and did not cry no more;" that at seven o'clock the tourniquet was still on the leg. It was taken off about twenty minutes past seven; that he saw the plaintiff's leg that morning and that there was a mark where the tourniquet had been and below this the leg was of a blue color.

The nurse who put the tourniquet on was called as a witness for the plaintiff and testified that she put it on to stop the bleeding; that she was assisted by one of the sisters in the hospital; that she did not remember having any calls to the room occupied by the plaintiff that

night but that she was there at least about every fifteen or twenty minutes; that the tourniquet was on the leg all night but it was loose so that she could put her fingers under it; that she first loosened it about ten or fifteen minutes after she put it on and left it loose for several minutes and then put it on as tight as before, as the foot was still bleeding; that she loosened it again later on; that she left the forceps in place, noticing however, that there was no swelling around the tourniquet to tighten it; that the tourniquet was still on when she was in the room about twenty minutes to seven in the morning but that it was loose. On cross-examination she testified that the tourniquet was not placed just below the knee as indicated by the plaintiff's father but above the prominent bone of the ankle.

It will be seen that the testimony offered by the plaintiff himself on the subject of the application of the tourniquet is conflicting. The strongest evidence that would go to establish any negligence in its application is that of the plaintiff's father, but he does not profess to have accurate knowledge nor to have observed closely what the nurses or nurse did at various times when they came to the room during the night, but he describes it as "fussing" with the tourniquet. This evidence would clearly not justify a finding that there was negligence in leaving the tourniquet tightly placed for an unnecessary length of time or so long as to have caused gangrene, for the plaintiff's evidence, coming from the witness who has the most accurate knowledge on the subject, clearly tends to prove the contrary.

It will be further seen by reference to the expert testimony offered by the plaintiff that there was no evidence tending to show that the treatment in relation to the tourniquet was improper or that it constituted negligence in treatment; neither does such testimony establish as a fact, or warrant the drawing of an inference of fact, that the condition of the plaintiff's leg resulted from the improper application of the tourniquet. On the contrary, it rather tends to establish that it did not so result. There is lacking in this case expert testimony on the subject of gangrene which would tend to show that the condition which later developed might have been obviated by resort to available measures of treatment when the defendant was called to treat the plaintiff. Whether or not the defendant's acts or omissions are consistent or inconsistent with proper practice under the facts disclosed

here is left a matter of conjecture for the jury, there being no evidence as to what proper practice requires in such a situation as that which confronted the defendant. The burden of proof is on the plaintiff. It was said by this court in Whitson v. Hillis, 55 N. D. 797, 215 N. W. 480, that, as a general rule, it is improper to submit a malpractice case to a jury without expert testimony to establish the standard according to which they are to judge the conduct of the defendant. Houghton v. Dickson, 29 Cal. App. 321, 155 Pac. 128; McGraw v. Kerr, 23 Colo. App. 163, 128 Pac. 870; Miller v. Toles, 183 Mich. 252, L.R.A.1915C, 595, 150 N. W. 118; Berkholz v. Benepe, 153 Minn. 335, 190 N. W. 800; Lorenz v. Lerche, 157 Minn. 437, 196 N. W. 564; Tady v. Warta, 111 Neb. 521, 196 N. W. 901. While it was held in that case that there was evidence upon which the jury could find negligence, in the absence of proof of such standard, it is clear to our minds that in a case like the present such an inference would be purely a matter of speculation. What did the defendant do that, consistently with good practice, he should not have done? What did the defendant omit to do that, consistently with good practice, he should have done? Did any such acts or omissions cause the injuries complained of? These questions find no answer in the evidence. It is elementary that the rule of res ipsa loquitur has no application in such cases. We can not reason from an unfortunate or bad result to a negligent cause. The evidence must show such cause. We are of the opinion that the general rule is clearly applicable to a case such as the present.

It follows from what has been said that the evidence is insufficient to support the verdict. We are unable to say that the deficiencies of proof are such that they can not be supplied on another trial; hence, the order of this court is that the judgment appealed from is reversed and a new trial granted.

NUESSLE, CHRISTIANSON, BURKE, and BURR, JJ., concur.