The defendant, a physician and surgeon, is charged with malpractice arising from the setting and treatment of a broken arm. The jury found for the plaintiff and, the court having denied a motion for judgment notwithstanding the verdict or for a new trial, the defendant appeals.
There are 87 assignments of errors, 66 of which deal with rulings on the admission of testimony, 17 with reference to the charge given to the jury and the remainder with rulings on the motion for a new trial, etc. In addition there is a specific allegation that the evidence is insufficient to sustain the verdict.
On the 17th of November, 1929, the plaintiff suffered a fracture of the ulna of the right arm at a point about one third of the distance from the wrist to the elbow. Two days thereafter, while he was in the hospital in Minot, the defendant was called to treat him, and set the bone giving some subsequent treatment. Plaintiff's claim is the bone was not properly set and that the proper subsequent treatment was not given. It is the claim of the defendant that under all of the circumstances of the case the union of the bone is a good union, and that if the plaintiff suffered from stiffness of the muscles and tendons *Page 372 
it was because of his failure to follow instructions given him by the defendant and his failure to come for treatment.
Many of the objections made by the defendant during the introduction of testimony center around the testimony given by one L.M. Ellithorpe. The plaintiff, in order to prove his case introduced certain X-ray pictures, some of which were taken by this witness.
As foundation for the introduction of these pictures the witness testified that he was a duly and regularly licensed chiropractic under the laws of this state, with several years' practice and with six years' experience in the making of X-ray pictures. He showed that he had made a thorough study of human anatomy for about two years while at school, and that this was part of his training; that he had taken several hundred of these pictures and knew the contour, position and action of the bones in the human body. He showed the position in which the arm was placed at the time of the taking of the X-ray, and stated the picture identified was a true and correct picture of the arm at the time the picture was taken. He was then permitted to testify as to what the picture showed — the break in the bone, its position and the nature of the union. To all of this the defendant interposed objections, the theory being that because the witness was a chiropractor, pursuing a system of treatment for human ills different from that pursued by the defendant, he was not competent to give expert testimony.
There was no error in permitting the witness to testify as to the taking of the X-ray photographs and what these showed. The fact that he was a chiropractic was a mere incident except so far as it showed his knowledge and study of human anatomy. The names, number and position of the bones in the human body are the same, whether one is a regular physician, a chiropractic or a laic. It is not the school which he follows; but his knowledge, experience and special training which qualifies the witness to testify as an expert in such cases. A chiropractor may testify as to matters in which he is qualified to speak so long as he is not attempting to testify in regard to a school of treatment separate and distinct from his. He could not testify as to the methods and practices of this other school without showing his qualifications therefor. He was not so testifying. In the matter before the court it was immaterial that he was a chiropractor. *Page 373 
If he had studied human anatomy so as to acquire special knowledge; if he knew how to take X-ray photographs so as to give correct representations; if he knew how to read and interpret them then he was qualified to speak. The question of the qualification of the witness is primarily one for the trial court. A chiropractor may testify and interpret an X-ray picture upon showing practice therein and professional study. See Ladlie v. American Glycerine Co. 115 Kan. 507, 223 P. 272, 273. The weight given his testimony is for the jury. There was no error in permitting his testimony on such subjects in this case.
Owing to the quality of the evidence introduced, as shown by the record, it is not necessary for us to pass upon other assignments of error in the introduction of testimony nor the allegations of error with reference to the charge given by the court or failure to charge.
According to the testimony of the plaintiff he was fifty-five years of age at the time of the accident. He broke his arm November 17, 1929. Two days thereafter he came to the hospital and the defendant commenced treatment. Plaintiff says the defendant examined the arm through an X-ray machine, attempted to set the bone, put on a cast with the assistance of one of the nurses, and that the defendant never examined it again through the X-ray; that the nurse put the arm in a sling with the palm of the hand up; that he returned in about four weeks, for treatment and this time the defendant opened the cast, drew it tighter and plaintiff went home for another two weeks; when he came back defendant was absent and he consulted Dr. C; later he went to another doctor and did not go back to defendant because he thought "he couldn't do me anything when it wasn't set right." He says that at the end of eight weeks the defendant told him to let the arm drop down to flex the joints and to "start to work with it but I was not able to do that;" and the other doctor told him to do the same, but it hurt too much; that he could turn his arm in a certain way but not in other ways; that Dr. Cameron took an X-ray and later Dr. Devine and that during the summer of 1929 Dr. Ellithorpe the chiropractor took X-ray pictures. It seems also that just about the time of the trial further X-rays were taken by Dr. Erenfeld and Dr. Knapp in the presence of the defendant. He also testified in regard to his pain, suffering and swelling. He says the defendant told me "I had *Page 374 
just as good an arm as I ever had." It is his claim that the defendant did not examine the bone by X-ray after the cast and bandages were put on. Later he testified his second visit to the defendant was four or five days after the arm was set. He admits the defendant told him unless he kept moving the fingers they would get stiff and that other doctors whom he employed thereafter, Drs. Cameron, Devine and Stone told him the same thing; that he did not want to go back to the defendant because he massaged his fingers so that they hurt; he was not able to stand the pain; that the doctor tried to get motion in the arm and the reason he did not go back to him was because he was afraid of the pain. The plaintiff furnished no expert testimony, being content to depend upon the cross-examination of the expert witnesses furnished by the defendant, and the examination of the X-ray pictures taken. These X-ray pictures were taken from different angles and at different distances. All experts who testified with reference thereto stated that the value of the picture depended largely upon the angle with which the picture was taken, the distance from the machine and other factors. Taking all of this into consideration however it is apparent that the apposition of the broken bone was not quite perfect. Either the broken parts were not set directly opposite each other or had slipped, but at the time the pictures were taken there was union; with a portion of a bone slipped past the other part to an extent that was noticeable on the picture. There is no testimony in the record which shows that this was caused by the defendant, or that it could have been avoided.
The defendant narrated the method which he employed for the setting of the bone and for the prevention of atrophy of the muscles and stiffness of the joints. He testified that at the time he set the bone he made use of the fluoroscope, that the light was placed over the part of the arm he desired to examine and that while it was in this position he could see the bone, tissues and muscles with perfect plainness. The arm was under the fluoroscope all of the time until the operation was completed; that it was only a matter of a few minutes to thus attend to the setting of the bone; that he had the arm placed in a sling, midway between pronation and supination; that this was the proper way; that he gave the plaintiff instructions to return in a few days for examination; that he did return and that after attending to him this *Page 375 
time he gave him instructions to return again, but that he did not return until the latter part of January or the first of February. There is a dispute of one visit between the parties; and also as to the position of the arm in the sling; but the defendant told how he gave plaintiff instructions for gentle movement of his fingers, and frequent massage and manipulation, but that when he attempted to thus treat him the plaintiff protested because of pain and refused to come back for further treatment.
In addition to the defendant four medical men testified as expert witnesses. The X-ray pictures introduced in evidence were submitted to each, and the examination of the picture was part of the foundation for his testimony. While all of these were produced as witnesses by the defendant yet two of them were doctors employed by the plaintiff himself for treatment after he had ceased to consult the defendant. All of these expert witnesses testified that the union of the bones was a good union, that the treatment given by the defendant was the proper treatment, that the stiffness of muscles, and loss of motion if any, came from the lack of exercise and that the longer this lack of exercise continued, the greater would be the difficulty in restoring motion and the greater the amount of pain suffered. On cross-examination an attempt was made to show that some if not most of the pain came from the effect of the projecting portion of the bones on the surrounding nerves. The experts deny this. The plaintiff's contention is that the lack of perfect apposition as well as the dispute regarding position of arm in the sling, and that a more or less ragged edge of bone might irritate the muscles and nerves, were facts for the jury to use in determining negligence. The plaintiff himself testified that the attempt at massage, the exercise of the arm, the treatment given by the doctors gave him great pain, in fact it is evident that one reason why he did not continue the exercise was because of the pain which it caused.
There is some dispute between the parties to this action as to the way in which the defendant set the bone and the extent of the use of what the plaintiff called the X-ray and the defendant said was the fluoroscope. There is no expert testimony whatsoever showing negligence in the setting of the bone. Plaintiff claimed one of these expert witnesses, whom he had consulted prior to the examination of the action, had told him his arm was ruined but this doctor denied this *Page 376 
statement. This however, would merely tend to affect the doctor's credibility. In the cross-examination of the experts time was devoted to the attempt to show that the defendant should have made an X-ray examination of the arm on the second and third visit of the plaintiff. It is admitted he did not do so and it is the theory that if he had done so the fact that one portion of the broken bone projected past the other would have been detected and could have been remedied, and failure to do so was properly a matter for the jury to determine whether it was negligence. Even if this were so the fact remains that all of the expert testimony shows a good union and correct practice. This is a matter peculiarly of good practice and on this feature expert testimony controls. See Gallagher v. Kermott, 56 N.D. 176,216 N.W. 569. It is not like the case of Whitson v. Hillis, 55 N.D. 797, 215 N.W. 480, where negligence could be determined without resort to expert testimony, or cases where the treatment given or neglected has become so much a matter of common knowledge that it ceases to require expert testimony. In Axford v. Gaines, 50 N.D. 341, 346, 195 N.W. 555, 557, we set forth the rule regarding expert testimony and showed such was not necessarily binding on the jury; but in this case there was contradictory testimony from empirics which, together with admitted facts in the case, justified rejection of the expert testimony.
It must be remembered the defendant is not responsible for the injury — he did not cause the fracture. He is not responsible for the result of his treatment unless the result be caused by his negligence. There is nothing shown in this case which was not consistent with good practice neither is there anything in good practice which the defendant did not do. The burden of proof is on the plaintiff to show that the proper method was not employed, that the proper treatment was not given and that the doctor violated some of the rules of good practice so that the result complained of necessarily came from this violation of good practice. According to all of the testimony in the case as to what is the standard of conduct for the defendant to follow, he followed. Taking the plaintiff's own testimony he does not contradict this. It is true he says the doctor looked through the X-ray but once when he was setting the bone but the undisputed evidence shows that the arm was at the machine all of the time the bone was being set and that the process required but a few moments of time. The doctor shows that *Page 377 
during all this time he had the arm under inspection. The doctor was not an insurer of the result. All the expert witnesses testify that though a portion of one of the pieces of bone had slipped past the other portion nevertheless in the course of time this was straightened by nature through the formation of callous and the process of union; that the work which was done was a good piece of work under all the circumstances; that unless the patient had his arm massaged, joints flexed, and muscles exercised there would be loss of power; that the longer this was delayed the more pain there would be in beginning such operations.
It is clear the evidence is insufficient to justify the verdict. As stated in Gallagher v. Kermott, 56 N.D. 176,216 N.W. 569, supra, "What did the defendant do that consistently with good practice, he should not have done?" What did he omit to do? It is possible the plaintiff may secure expert testimony to contradict what has been shown by the defendant, therefore the action will not be dismissed, but the order denying new trial will be reversed and the case remanded for a new trial.
BURKE, Ch. J., and NUESSLE, BIRDZELL, and CHRISTIANSON, JJ., concur.