George T. BENZMILLER, Plaintiff, Appellant, and Cross-Respondent,

v.

Joel C. SWANSON, M.D., Defendant, Respondent, and Cross-Appellant.

No. 7977.

Supreme Court of North Dakota.

Oct. 2, 1962.

Frederick E. Saefke, Jr., Bismarck, for plaintiff, appellant, and cross-respondent.

Nilles, Oehlert & Nilles, Fargo, for. defendant, respondent, and cross-appellant.

STRUTZ, Judge.

This is an appeal from an order granting a new trial. The complaint of the plaintiff against the defendant, an orthopedic physician and surgeon, charges the defendant with malpractice in the setting and treatment of a broken arm.

The plaintiff was involved in a farming accident on Saturday, July 12, 1958, when he fell from a hayrack while loading baled alfalfa. The field where the accident occurred had been fertilized with manure. The plaintiff was immediately taken to a local doctor in a nearby town but, on examination of the plaintiff's injury, the local doctor determined that the plaintiff had suffered a compound comminuted fracture; that the injury was potentially very dangerous and constituted a medical emergency which should not be treated by a general practitioner. The plaintiff thereupon was advised to go immediately to Fargo for treatment.

On arriving at the St. John's Hospital emergency room, X-rays were taken of the

plaintiff's injury and these disclosed to the intern on duty that the plaintiff had suffered a compound comminuted fracture. The plaintiff requested that the defendant be called, and he was called by the intern on duty. The defendant thereupon directed the intern to admit the plaintiff to the hospital and stated that he would see the patient in the morning. The intern also informed the defendant that he believed the plaintiff had suffered a compound comminuted fracture, and, according to the testimony of the intern, that the bone could be seen through the opening of the skin. The defendant did not order the administering of antibiotic drugs to avoid or control infection, but did order the cleansing of the plaintiff's arm and wound and the administering of a pain-killing drug and a tetanus antitoxin. Plaintiff was not prepared for surgery, although the intern testified that, in his opinion, the injury constituted a surgical emergency.

The defendant made no attempt to see the plaintiff that evening. Later, on the same day, he was contacted by a registered nurse employed at the hospital, giving defendant further information regarding the plaintiff's injury. This nurse was the plaintiff's sister-in-law. The defendant, however, made no attempt to see the plaintiff until approximately five o'clock on the following day, after again having been called by the hospital. His examination of the plaintiff's injury on this occasion was very superficial. Later that evening, plaintiff's arm was cleansed, shaved, and prepared for surgery, which the defendant had announced he would perform the following morning. This preparation for surgery was made by persons other than the defendant, and presumably at the defendant's direction.

The operation was performed on the following day, the 14th of July. After the operation, a cast was applied. Sometime thereafter, the arm began to bother the plaintiff and the defendant ordered a "window" cut in the cast for purposes of observing the injury. By July 17, an infection had set in and some of the stitches were removed from the infected parts of the wound. On the visit of July 17, and on subsequent visits, the defendant removed tissue from the wound. On July 21, one week after the operation and nine days after the plaintiff had suffered the injury, the defendant removed more dead tissue and then informed the plaintiff that he was quitting the case. He gave as a reason for his action the "interference" of the plaintiff's sister-in-law. Defendant thereupon presented to the plaintiff a release which he requested the plaintiff to sign, which the plaintiff did execute. The release purports to absolve the defendant of all responsibility for treatment of the gas gangrene which had developed in plaintiff's wound.

Prior to the giving of such release, when it became apparent that the plaintiff had infection, other medical doctors were called into the case at the request of the plaintiff and, on the defendant's withdrawing from the case, a Doctor Murray examined the plaintiff and found the arm badly swollen, the skin brown and discolored, and skin stitches removed. Doctor Murray instituted a vigorous debridement of the wound, including the removal of dead, devitalized, and necrotic tissue, and skin, muscle, and bone fragments. At that time the plate which had been inserted by the defendant at the time of the operation fell out.

By August 9, the plaintiff's condition was such that it was felt that he could be discharged from the hospital to await developments. The gas gangrene had been controlled, but much of the tissue and muscle on plaintiff's arm had been removed. During the time between such discharge and the plaintiff's return to the hospital, on September 6, he was treated at a clinic. By the time of his return to the hospital, there had been further tissue loss and much of the muscle and many of the nerves of the forearm had been removed, and the evidence shows that plaintiff's arm had become useless. On September 6, when the plaintiff was readmitted to the hospital, his arm was amputated.

The record shows that amputation was necessary because of osteomyelitis, or bone infection, which the plaintiff's witnesses testified was due to loss of tissue and muscle damaged by infection, which loss of tissue and muscle exposed the bone and caused it, in turn, to become infected.

Dr. Paul Johnson, a qualified orthopedic surgeon, testified as an expert for the plaintiff. He stated that good surgical practice requires a doctor to assume that all compound fractures are potentially contaminated and infected; that all compound fractures should be treated as surgical emergencies, and that this is especially true where the injury occurs in rural areas where the ground is more likely to be contaminated by animal refuse. Doctor Johnson further testified that, in cases of compound fracture, the wounds should be cleansed to eliminate all foreign matter at the earliest possible moment and, in any event, within six to eight hours of the time of injury, and that this should be done by a physician or surgeon sufficiently qualified to adequately appreciate the seriousness of the situation; that antibiotic drugs should be administered to control infection; and that such treatments should be started on the day of the injury and as soon as possible after the injury.

Doctor Murray, a general surgeon, whose experience included two years of army service where his practice involved treatment of bone injuries and whose private practice as a general surgeon in Fargo for a period of four years also embraced treatment of bone injuries, corroborated the testimony of Doctor Johnson on all major points. A portion of Doctor Murray's testimony, to the effect that he felt the operation on plaintiff's arm should have been performed as soon as possible after the injury, instead of two days later, was stricken by the trial court.

The defendant testified that he was not certain that the plaintiff had suffered a compound comminuted fracture until he performed the surgery on the second day following the accident; that he did not diagnose the plaintiff's injury as a compound fracture from the X-rays; and that, although the intern had told him that plaintiff had suffered a compound fracture, he had asked the intern whether the bone was protruding and was informed that it was not.

Several competent orthopedic surgeons testified on behalf of the defendant and stated that the procedures followed by the defendant under the circumstances were right and proper.

The defendant further testified that he saw no sign of infection until the morning of July 17, three days after the operation, and that when he, the defendant, left the case on July 21 because of interference of the plaintiff's sister-in-law, he felt sure that he had saved the plaintiff's life and the use of his hand.

On this record, the jury found for the plaintiff.

Upon entry of judgment on the verdict, the defendant moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. Several grounds were urged in support of such motion:

1. Insufficiency of the evidence to justify the verdict and errors of law occurring at the trial, including denial of defendant's motion for directed verdict;

2. Irregularity in the procedure of the jury and the court during the jury's deliberations, such irregularity consisting in the court's permitting the jury to be brought into open court on two occasions to apprise the court that agreement on a verdict appeared to be impossible, and in the court's urging the jury on each occasion to continue deliberation; and in the further statement of the court, on the occasion of the jury's second such filing into open court, that a new trial would involve considerable expense and that, if possible, a verdict should be reached; that the jury, after some further deliberation, did reach a verdict; and that all of such proceedings were had without notice to either party, or

attorney for either party, contrary to the provisions of Section 28–14–19 of the North Dakota Century Code;

3. On the ground of further irregularity in that the jury considered the possibility of liability insurance protecting the defendant in this action; and

4. That the verdict of the jury is excessive, appearing to have been given under the influence of passion and prejudice.

The trial court denied the motion for judgment notwithstanding the verdict, but granted the motion for new trial on the ground of insufficiency of the evidence. All other grounds urged in motion for new trial were specifically rejected by the court.

The case is now before this court on appeal from the order granting the defendant a new trial.

■ A motion for a new trial, on the ground that the evidence does not justify the verdict, is addressed to the sound, judicial discretion of the trial court, and the order granting such motion will not be reversed on appeal unless the record discloses a clear abuse of such discretion. Haslam v. Babcock, 72 N.D. 581, 10 N.W.2d 239; Stokes v. Dailey (N.D.), 97 N.W.2d 676.

The trial court felt that there was little or no evidence proving that the plaintiff's injury was a direct and proximate result of the negligent acts or negligent omissions on the part of the defendant. In passing on the defendant's motion, the trial court says:

"The reason why a new trial has been granted in this Case, is that the Court is of the opinion that there is no evidence in this Case, or at least not a fair preponderance of the evidence, proving that Plaintiff's injury, namely the amputation of his arm, was a direct and proximate result of negligent acts or negligent omissions on the part of the Defendant."

■ The trial court, therefore, granted a new trial in this case because he was of the opinion that there was no evidence showing that what the defendant did or did not do caused either the gas gangrene or the osteomyelitis, necessitating the amputation of plaintiff's arm. If the trial judge was in error in his conclusion that there was no competent evidence in the record from which the jury could draw a reasonable inference that the doctor's acts or omissions proximately caused the plaintiff's injury, then his decision must be reversed.

The trial court, in his memorandum granting a new trial, stated further that a new trial was being ordered because, from a consideration of all of the evidence, in the opinion of the trial court, justice so required.

■ This court has held that a case once tried and concluded by a verdict should not be reopened and retried unless a careful examination of the record shows that justice so requires. Sullwold v. Hoger (N.D.), 110 N.W.2d 457.

This court has also held that, although the granting of a new trial based on insufficiency of the evidence involves the exercise of discretion on the part of the trial court, this discretion must not be abused; and that, where a verdict is supported by the great preponderance of the evidence, it is an abuse of discretion to grant a new trial on the ground of insufficiency of the evidence. Hamre v. Senger (N.D.), 79 N.W. 2d 41.

This court has further held that an order granting a new trial on the ground of insufficiency of the evidence will not be reversed as readily as will be an order denying a new trial, since the order granting a new trial does not finally determine the case. Mischel v. Vogel (N.D.), 96 N.W.2d 233.

■ In other words, appellate courts are more reluctant to interfere with the action of the trial court in the granting of a new trial than they are where a new trial has been denied. Thus the question of whether a new trial shall be granted on the ground of insufficiency of the evidence rests large-

ly within the sound, judicial discretion of the trial court, and, unless an abuse of discretion is shown, the action of the trial court will not be disturbed. Yet, where the verdict is supported by a great preponderance of the evidence, it is an abuse of discretion on the part of the trial court to grant a new trial.

■ Generally, in the absence of a special agreement, a physician or surgeon does not guarantee or insure a good result, or that he will effect a cure. Ness v. Yeomans, 60 N.D. 368, 234 N.W. 75; Stokes v. Dailey (N.D.), 97 N.W.2d 676; 70 C.J.S. Physicians and Surgeons § 47, p. 954.

■ A physician does have an implied obligation arising from his employment to see that no injury shall result from any want of care or skill on his part. Schoening v. Smith, 59 N.D. 592, 231 N.W. 278.

■ A physician need exercise only such reasonable care and skill as are exercised ordinarily by physicians practicing in similar localities in the same general line of practice. McDonnell v. Monteith, 59 N.D. 750, 231 N.W. 854.

■ Let us now examine the record to determine whether there was ample evidence to support the verdict for the plaintiff, or whether the action of the trial court in granting a new trial was an abuse of discretion under the rules announced by this court. If there was no abuse of discretion, then the order appealed from must necessarily be affirmed.

Expert orthopedic surgeons testified in support of and in opposition to the contentions of the plaintiff in this action. The plaintiff alleges in his complaint that the defendant failed and neglected to use ordinary care in treating the plaintiff's injuries, in failing to make an examination of the plaintiff's injuries, in failing to care for or properly cleanse the plaintiff's injuries, in failing to administer or to order the administering of antibiotic drugs to avoid or to check any infection in the plaintiff's wound, and in failing to treat the plaintiff's injury as a surgical emergency; that as a result of such negligence on the part of the defendant the plaintiff's wound became infected and much of the tissue and muscle around the injured area became contaminated, dead, and devitalized and that the bone became exposed, infected, and contaminated; and that, as a result thereof, it became necessary to amputate the plaintiff's arm.

These allegations of the plaintiff are supported by positive testimony of expert witnesses. Doctor Johnson testified that the cleansing and preparation for surgery of such an injury should not be done by a resident doctor or an intern. He stated:

"I feel that this should be done by a physician or surgeon sufficiently qualified to adequately appreciate the seriousness of the situation and I feel that in general an intern is not an adequate individual to whom to delegate this responsibility."

Doctor Johnson also said:

" * * * one should assume I believe that all compound fractures are potentially contaminated and infected."

Doctor Johnson further testified that, in this case, it was his opinion that failure to prevent the initial infection ultimately caused the gangrene which resulted in the loss of muscle and tissue and which exposed the bone and caused its infection. In answer to a question as to what caused the eventual loss of the plaintiff's arm, Doctor Johnson testified:

" * * * The initial infection that was not adequately prevented, the eventual spread of the gas gangrene and with it a secondary type of infection with loss of function of the hand because of necrosis and gangrene of the muscles of the forearm requiring the eventual removal of the arm in order to control the infection and get rid of a useless hand."

The witness then continued:

"I feel that the inadequate surgical debridement and cleansing of the initial puncture of the compound fracture wound permitted the retention of devitalized tissue and of bacteria which eventually became clinically manifested by gas gangrene."

Doctor Johnson testified positively that all compound fractures should be treated as surgical emergencies and that all open fractures should be treated within six to eight hours after the initial injury in order to reduce the danger of infection to a minimum.

With reference to the administration of antibiotic drugs in circumstances such as were present in this case, Doctor Johnson testified that, in the treatment of the plaintiff:

"I should say as far as antibiotic drugs, started too late and probably in inadequate amounts when they were started."

In corroboration of Doctor Johnson's testimony, Doctor Murray stated that an open fracture "represents a surgical emergency in that it requires care as soon as it can be done," and that all open fractures should be treated with the assumption that the wound is contaminated. He further testified that an open fracture should be treated and closed as soon as possible to avoid danger of infection, and that antibiotic drugs should be administered at once to prevent infection.

■ There was strenuous objection to Doctor Murray's testimony, on the ground that, as a general surgeon, he was not competent to testify to proper methods of treating a compound fracture by an orthopedic surgeon. We believe that a general surgeon, whose professional experience included treatment of bone injuries during two years of army service and whose civilian practice included treatment of bone injuries, was competent to testify as to proper treatment of the compound fracture of the plaintiff's arm. Objection that he was not a skilled orthopedic surgeon went to the weight of his testimony, rather than to his competency to testify. Young v. Stevens, 132 N.J.L. 124, 39 A.2d 115.

■ Thus there is a great preponderance of the evidence supporting the verdict of the jury in this case. True, there were two orthopedic surgeons who testified on behalf of the defendant and only one who testified on behalf of the plaintiff, but there was much other competent evidence supporting the plaintiff's claim. In any event, the preponderance of the evidence is not determined by the number of witnesses who testify. A jury is always free to determine the preponderance of the evidence from all of the evidence, i. e., the evidence worthy of belief. In other words, "preponderance of the evidence" does not necessarily refer to the testimony of the greater number of witnesses, but "evidence more worthy of belief," or "the greater weight of the evidence." The "preponderance of the evidence," therefore, does not mean "the greater number of witnesses" or "the greater amount of testimony," but "testimony that brings the greater conviction of truth." Barkow v. Donovan Wire & Iron Co., 190 Mich. 563, 157 N.W. 55.

Thus, although the greater number of orthopedic expert witnesses testified for the defendant, that in itself does not prove that the preponderance of the evidence favored the defendant. We should point out that some of the defendant's own expert witnesses gave testimony from which the jury could find that the defendant was negligent in not personally looking at the plaintiff's injury on the evening plaintiff was brought into the hospital and in delaying any personal examination of such injury until the second day following the accident, when the defendant performed surgery on the plaintiff's arm. Doctor Moe, an orthopedic surgeon from Minneapolis who testified on behalf of the defendant, was asked on cross-examination whether

he would have examined the injury personally if he had been informed by his intern that a patient had suffered a compound comminuted fracture and that the bone could be seen. He replied:

"I would say I would be inclined to, yes, sir."

Yet, in spite of this information received from the intern who admitted the plaintiff to the hospital, the defendant did not examine the plaintiff's injury until late afternoon on the following day, after again having been called by the hospital, when he briefly examined the patient's arm and announced that he would operate the next day.

Therefore, although the granting of a new trial on the ground of insufficiency of the evidence involves the exercise of discretion on the part of the trial court, where the trial court bases his decision to grant a new trial on the erroneous belief that there is no evidence or, at best, very little evidence showing that what the defendant did or did not do caused injury to the plaintiff, and where the trial court is in error in his conclusion, and there is a preponderance of the evidence supporting the jury's verdict, the decision of the trial court must be reversed.

We next consider the defendant's contention of irregularity in the proceedings of the jury in court during the course of the trial, in that the jury twice asked to be conducted into open court and on each occasion stated that it was unable to arrive at a verdict. On both occasions, the court urged the jury to try again. Counsel for neither the plaintiff nor for the defendant were notified that the jury was returning into court.

Section 28–14–19 of the North Dakota Century Code provides:

"After the jurors have retired for deliberation, if there is a disagreement between them as to any part of the testimony, or if they desire to be informed of any point of law arising in the case, they may require the officer to conduct them into court. Upon their being brought into court the information required must be given in the presence of or after notice to the parties or counsel."

■ Here, the defendant makes no showing that the jury requested or desired further instructions on the law, or that there was any disagreement among the jurors as to any part of the testimony. The jurors merely felt that they were deadlocked and so informed the court. We do not believe it was necessary to notify the parties prior to receiving word from the jury of such stalemate since the statute requires the presence of or notice to parties or counsel only. if there is disagreement among the jurors as to any part of the testimony or if the jurors desire to be informed on any point of law. In this case, the jury was told that it was in the best interests of all that a verdict be reached. It is our opinion that the remarks made by the court to the jury were perfectly proper, and not grounds for a new trial. As this court said, in the case of Borstad v. La Roque (N.D.), 98 N.W.2d 16, trial courts should scrupulously avoid any statement or suggestion which would induce the jurors to conciliate arbitrarily or coerce them into returning a verdict at the cost of any juror's surrendering his honest convictions. Nothing that was said by the trial court in this case should have in any way coerced the jury into arriving at a verdict contrary to the honest convictions of any juror.

■ The defendant alleges further irregularity in proceedings because the jury, in its deliberations, considered the possibility of liability insurance protection for the defendant. No proof is offered to show that such discussion, if it did take place, was prejudicial to the defendant. Merely discussing that possibility is not reversible error, in the absence of a showing that such discussion, if it did take place, was prejudicial to the defendant.

The defendant contends that the amount of the jury's verdict is so excessive that it indicates passion and prejudice on the part of the jury. We do not believe there is any merit to this contention. A review of recent decisions discloses awards of several times this amount, in cases involving similar injuries. We do not believe that a $25,000 verdict for loss of the left forearm of a fifty-three-year-old farmer is in any way excessive.

The order of the trial court granting a new trial is reversed, and the case is remanded with direction to reinstate the jury's verdict.

SATHRE, C. J., and MORRIS, BURKE and TEIGEN, JJ., concur.