**STATE of North Dakota, Plaintiff and Respondent,**

v.

**Ambrose Collin CHAMPAGNE, a/k/a Ambrose Louis Champagne, Defendant and Appellant.**

**Cr. No. 425.**

Supreme Court of North Dakota.

June 2, 1972.

John C. McClintock, Rugby, and Ziegler & Butz, Rugby, for defendant and appellant.

Helgi Johanneson, Atty. Gen., Bismarck, and John B. Hart, State's Atty., Rolla, for plaintiff and respondent.

ERICKSTAD, Judge.

At about 1:15 a. m. on June 13, 1971, the jury impaneled in this case found the defendant Ambrose Collin Champagne guilty of the crime of murder in the first degree. On July 17, 1971, Mr. Champagne was sentenced to imprisonment in the State Penitentiary at hard labor for life. On September 13, 1971, he filed his notice of appeal with the clerk of court of Rolette County, appealing from the verdict of guilty and the judgment of conviction. On May 2, 1972, oral arguments were made in this court on behalf of the defendant in support of his appeal by his counsel and in opposition thereto by the State's Attorney of Rolette County.

At the close of the State's case, the defense rested. That we may know the evidence upon which the jury acted, let us briefly review the testimony of the various witnesses called on behalf of the State.

Frank Russell St. Clair, age 61, testified as follows: On the 25th of February 1971

he was living with his wife, Alice, on the north side of Dunseith, North Dakota, in a two-room house, approximately 16 x 14 feet. The room at the front of the house contained Mr. and Mrs. St. Clair's two beds, separated by a dresser. There was another bed in the small room at the rear of the house. Mr. St. Clair suffered from arthritis and was confined to his bed on that day, unable to rise without his wife's help. He also suffered from failing eyesight, had broken his glasses and had not yet replaced them.

To identify the defendant in the courtroom, Mr. St. Clair had to be led to within three feet of him. His hearing was so poor he had to request the State's attorney to "holler" at him.

Mr. St. Clair testified further:

At the time his wife went to bed he had an opportunity to see her face and there "was nothing wrong with her." There were two boys sleeping in the rear room, and a baby grandchild and Ambrose Champagne with them in the front room. Mr. St. Clair told Ambrose to sleep in the back room with the boys or sleep with him, but Ambrose took his boots off, turned out the lights and went the other way, presumably to Mrs. St. Clair's bed. He heard his wife say, "Be careful for the baby." He also heard a sound which he described as "a bumping wail."

After a recess, Mr. St. Clair stated that his wife had said to Ambrose, "Get out of here," and "Go and sleep over there with Russell."

Mr. St. Clair said that later LeRoy Poitra came into the house, put the light on and went back outside. Then Mary Norman and Paulie Baker came in the house and Mary grabbed a club and started hitting Ambrose, who was lying on the floor.

LeRoy Poitra's testimony, in essence, follows:

He was 22 years old and on February 25, 1971, he was living in Dunseith. He had known Mr. and Mrs. St. Clair for approximately one year and had known Ambrose Champagne nearly all of his life. He estimated Mrs. St. Clair's height at about 5' 2" and her weight at 90 pounds.

At about seven o'clock in the evening of February 25, he and a group that included Ambrose Champagne were drinking beer and wine at his home and from there they went to the home of Cecelia Deschamp, also known as Celia Day, where they drank more wine. At about 9 o'clock, LeRoy went alone from the Day house to the St. Clair house, where there was another gathering of people drinking wine. He did not take any liquor along with him to the St. Clair house, but he was offered drinks from someone else's supply. He could not remember if he had anything to drink in the house, but he drank some beer in the car outside. Mrs. St. Clair was in bed all the time he was there and he did not talk to her or look at her face. He could not recall seeing her take part in the drinking.

Ambrose Champagne arrived at the St. Clair home about an hour after LeRoy, and because Ambrose was so drunk that he fell on the floor, Leroy and Delmar Baker tried to put him to bed in the back room, but Ambrose got right up again.

At about eleven o'clock, LeRoy left the St. Clair house to go for a drive with a new acquaintance, Van Counts, and Lucy Lily, Mary Norman, and Paul Baker, who drove the car. They "sat around and drank" at the home of Riel St. Pierre for a while.

When they returned to the St. Clair home to check on Mrs. St. Clair's daughter's baby, at about 1:00 or 1:30 a. m., LeRoy went into the house alone, turned on the light, and saw Mr. St. Clair in bed, and Mr. St. Clair told him to look around. LeRoy then saw Mr. Champagne lying on top of Mrs. St. Clair on the floor, with his pants down to his calves, his legs together between Mrs. St. Clair's, and his head near her right shoulder. They were "stomach

to stomach", with Mr. Champagne's toes pointing toward the floor. LeRoy received no response to his order to Ambrose Champagne to get up, and at that time he did not notice anything unusual about Mrs. St. Clair's face. He went outside to the car and accompanied Mary Norman and Paul Baker back to the house and, although he did not go inside then, he saw Mrs. St. Clair's face and noticed that something was leaking from her right eye. [Others testified that it was Mrs. St. Clair's left eye that was injured.] When Mary Norman came out of the house, the group went to the Van Counts home to call the police, and LeRoy and the others stayed there while Mary Norman and Lucy Lily went back to St. Clair's.

Kenneth Morin, age 19, testified that he and his brother Randall Paige had been drinking that day and that they slept in the back room at the St. Clair home that night. He said that he had gone through the main room on his way to bed and that at that time Alice St. Clair was in bed with the baby, her husband was in his bed, Delmar Baker was standing near the door, and Ambrose Champagne was looking for milk for the baby. Kenneth said that he went to sleep and, although he heard voices from the main room, he did not become fully awake until the police came to take him and his brother to the police station.

Randall Roy Paige, age 17, testified that he had been drinking "quite a bit" that night, did not recall going to bed, and was still drunk when he woke up.

Mary Norman testified, in essence, that she was a niece of the deceased, that she was thirty-eight years old, had been divorced since 1961, and had borne eight children, ranging in age from one and a half years to twenty-one years. She had met Ambrose Champagne previously, had seen him in bars in Dunseith, and he, along with several other friends and relatives, had stayed at her house in Minot when she lived there. Mr. Champagne had been looking for a job and, having no other place to stay, remained at her house for three days.

When she and Paul Baker entered the St. Clair house at about one o'clock, "There was a guy sleeping at the foot of the bed, the little single bed, but I don't know who he was." She saw the dried blood on Alice St. Clair's eye. When she had seen her aunt Alice the previous day, she had seen no blood near her eye.

Mary said that when she entered the house Ambrose was on top of Mrs. St. Clair, their private parts were exposed, his legs were between her legs, and his penis was inside of her. Asked by one of the defense attorneys, "What was going on?", she replied, "Well, he was intercoursing her; that was what he was doing." She described Ambrose's penis as "big and red looking" and said, "It looked like it was hard when I pulled him off of there."

She testified further that when she pulled Ambrose off Mrs. St. Clair she proceeded to hit him with a block of firewood and that he said, "Don't hit me, La Biche." Under questioning, she disclosed that "La Biche" had been her nickname all her life.

She identified a photograph of her aunt taken at the scene, but stated that the sweater had been higher on the body than shown on the photograph. She said that her aunt had been unclothed from the waist down and that, "Her breast was showing when I pulled him off." The photograph of Mrs. St. Clair reveals an injury to her left eye.

Mrs. Norman said that she took the baby with her when she went to call the police and she returned with them to the St. Clair house to get the baby's bottle and then left immediately.

Keith Jeanotte, the policeman who went to the St. Clair house along with Mary Norman and a patrolman, testified that it was fourteen minues past midnight when they arrived at the house. Mrs. St. Clair, clad only in a grey sweater, was naked from the waist down, lying on the floor with her

legs spread, and there was a large purplish portion of skin around her left eye. He could not recall seeing any blood on the wound. He examined Mrs. St. Clair to determine whether she was still alive and he found no signs of life.

Ambrose was "Laying opposite the victim on his side in the opposite direction, his feet pointing towards her feet." He had bruises and spots of blood on his face. Officer Jeanotte said, "He did mumble at least once to my knowledge, 'I am sorry, cousin.'" Officer Jeanotte took seven snapshots of the scene and said that no one touched the body while he was present.

Dr. John Sawchuk, a medical doctor practicing in Rolette, North Dakota, testified that he was called to Dunseith at approximately 1:30 a. m. and arrived at approximately 2 a. m. When he reached the St. Clair residence, the body was covered with a sheet, the chest was covered with a light sweater, and "there appeared to be a slip only covering below the waist area." He determined that the body was not alive, that the head appeared to have a large bruise over the left eyebrow area and that there appeared to be a hemorrhage in the lining of the eye itself. There was blood present on the forehead and a sticky substance on the skin and hair. He concluded the substance was syrup, because he noticed an empty syrup bottle in the corner of the room.

Dr. Sawchuk said that he examined the lower trunk of the body and that, "No definite bruise was noted on that part of the body with the light I had available." He also said that he found no bruises or other marks on the external genitalia. Dr. Sawchuk made the arrangements for the autopsy.

At 3:30 a. m., he examined Ambrose Champagne for possible injuries and took a smear from the glans of the penis for possible laboratory analysis. It was labeled and left with the police officers, and the State did not introduce any evidence in regard to this.

Dr. Skarphol, a medical doctor and Assistant Professor at the Pathology Department of the University of North Dakota, performed the autopsy on a body, which he photographed. That photograph, introduced as Exhibit No. 8, was identified by Officer Jeanotte as being a photograph of the body that he had examined at the St. Clair house.

Dr. Skarphol said that according to his knowledge, bruises or bruise-like changes can develop after death, but as to the eye injury, "The purplish discoloration and the extensive swelling indicate this occurred while the heart was still pumping blood, so the patient was still alive."

He further observed that, "There was marked swelling and purplish discoloration involving both the left upper and lower eyelids. There was a quarter-sized bruise approximately one inch lateral to the left eye. There was a linear bruise on the right cheek; a small bruise over the left eyebrow and a small bruise under the chin. * * * There was a bruise behind the left knee. There was a bruise on the * * * buttock area. * * * There was a bruise on the left elbow and a bruise on the lower back in the chest area * * *." He also found a bruise and abrasion of the skin about two inches below the lower edge of the shoulder blades, but he could not say with any medical certainty that they occurred prior to death. The blood on the sweater was of the same blood-type as that of Mrs. St. Clair.

The autopsy showed that: "Both lungs were heavier than the average weight. Both lungs had pus-like material on the outer surface and on microscopic examination, both lungs had extensive areas of bronchial pneumonia and bronchitis as well as scattered areas of pulmonary edema. * * * The heart was the average weight for this sex. Gross or visual examination of the heart was within normal limits except for a dilation of the right side of the heart. Microscopic examination of the heart showed two small areas of recent heart attack, approximately two or four weeks

old." There were dried blood stains on the right hand, right heel and left knee.

He said: "The vagina contained a small amount of blood together with a small amount of mucus and had a short tear in the anterior wall * * * approximately two and a half centimeters which would be about an inch. * * * Microscopic examination showed that there were no pus cells in the area yet, so that I could conclude this tear had been produced within six hours prior to death." Later in his testimony he gave the dimensions of the tear as "less than two centimeters long, approximately three-tenths or a quarter of an inch deep and approximately one-eighth inch wide."

Dr. Skarphol made a test for the presence of sperm in the vagina and found none. He explained that, "This does not imply that there was no ejaculation into the vagina. It means you could have an ejaculation in a person who is unable to produce sperm from mumps; from his having his tubes tied and so forth and so that you could still have some semen present and no sperm." He stated that he had been unable to make a test for semen because he could not obtain sufficient material from the vagina to do the testing, and that in a normal ejaculation there would be sufficient fluid to test for semen. Answering a question from the State's attorney, he said: "As I define sexual intercourse, it involves penetration only. Not necessarily ejaculation."

Dr. Skarphol found that the cause of death, based upon reasonable medical certainty, was asphyxia. He explained: "There was severe disease in her lungs. She had extensive pneumonia, bronchitis, and excess amounts of fluid present in the air sacs of her lungs. This would have hindered her ability to get oxygen and thus death by asphyxia." Asked by the State's attorney what effect fighting or scuffling would have on the ability of lungs in such a diseased condition to transmit oxygen to the blood, Dr. Skarphol said: "Fighting or scuffling increases his general require-

ments and therefore the net effect on the body would be that—you may get a compromise situation where the lungs can't provide enough oxygen as required with the fighting and scuffling."

Dr. Skarphol could not state with absolute certainty that she would not have died of pneumonia without external factors.

The information charging Mr. Champagne initially contained two counts, one charging him with having committed the crime of murder in the first degree as defined by Section 12–27–12, N.D.C.C., and the other charging him with having committed the crime of rape in the first degree as defined by Section 12–30–04(1), N.D.C.C.

The pertinent part of the information read:

### "COUNT ONE:

"That on or about the 25th day of February, 1971, in the Township of Gilbert, in the County of Rolette and State of North Dakota, the said defendant, being over the age of twenty-four years, did cause the destruction of the life of a human being, to-wit: one Alice St. Clair, while he accomplished an act of sexual intercourse with said Alice St. Clair, a female, not the wife of said defendant, while she resisted, but her resistance was overcome by force and violence."

### "COUNT TWO:

"That on or about the 25th day of February, 1971, in the Township of Gilbert, in the County of Rolette and State of North Dakota, the said defendant, being over the age of twenty-four years, did accomplish an act of sexual intercourse with one Alice St. Clair, a female, not the wife of the said defendant, while she resisted, but her resistance was overcome by force and violence."

Upon motion made by the defendant, the State was forced to elect between the counts and it elected to try Count One first.

Count One involves the felony-murder doctrine incorporated in our law under Section 12–27–12, N.D.C.C., which reads:

"Degrees of murder defined.—Every murder perpetrated by means of poison, or by lying in wait, or by torture, or by other willful, deliberate, or premeditated killing, or in committing or attempting to commit any sodomy, rape, mayhem, arson, robbery, or burglary, is murder in the first degree. All other kinds of murder are murder in the second degree."

In the brief filed on Mr. Champagne's behalf, nine specifications of error are asserted. We shall discuss them in the order in which they have been set forth in the brief.

Specification of Error No. I reads:

"The Court erred in pronouncing judgment on the Defendant because the Court lacked jurisdiction to pronounce such judgment, since the verdict was erroneous in that it is contrary to the law and not in conformity with the evidence in that the jury disregarded the possibility of a reasonable doubt in the evidence in that the death of Alice St. Clair could have occurred without external factors, because of the presence of pneumonia, advanced age, previous heart trouble, malnourishment and bronchitis."

To answer Specification of Error No. I, we must decide whether the evidence supports the verdict of guilty of murder in the first degree. In determining this issue, we must keep in mind the scope of our review.

■ In an arson case based upon circumstantial evidence, and some of the evidence in the instant case would have to be considered circumstantial, we quoted with approval from Corpus Juris Secundum as follows:

" 'While a case based on circumstantial evidence should be scanned with caution, the fact that the evidence is circumstantial and conflicting does not alone empower the appellate court to weigh it or

determine its sufficiency, if it reasonably tends to prove the guilt of accused and fairly warrants a conviction. The question is whether there is evidence to support the verdict; and a verdict based on circumstantial evidence carries the same presumption of correctness as other verdicts, and will not be disturbed unless wholly unwarranted, even though the evidence is weak and unsatisfactory to the appellate court. The reviewing court is not required to explain the process by which the jury arrived at their determination.

" 'Where the circumstances are consistent with the hypothesis of accused's innocence as well as with that of his guilt, the jury, or the trial court trying the case without a jury, must draw the inference, and an appellate court will not substitute its judgment for that of the jury or of the trial court. This rule should not be confused with the rule laid down for the guidance of the trial court * * * that the evidence must be of a conclusive character and must exclude every reasonable hypothesis of innocence. * * *' 24A C.J.S. Criminal Law § 1882 (1962)." State v. Carroll, 123 N.W.2d 659, 669 (N.D.1963).

Realizing that an appellate court is not to substitute its judgment for that of the jury, we have examined the evidence to determine whether it supports the verdict, rather than to determine whether some other verdict could have been returned.

■ Having set forth the basic facts upon which the jury decided this case, without restating them or attempting to further summarize them, it is our conclusion that the evidence supports the verdict of the jury.

Specification of Error No. I infers that the jury failed to give due consideration to the possibility that Mrs. St. Clair died because of "pneumonia, advanced age, previous heart trouble, malnourishment and bronchitis" and not because of any act of the defendant. In light of the trial court's

instructions, such an inference is unreasonable.

Before the jury began its deliberations the court instructed the jury, in part, as follows:

"Mere probabilities are not sufficient to warrant a conviction. Nor is it sufficient that the greater weight or preponderance of the evidence support the allegations of the Information, nor is it sufficient that on the doctrine of chance it is more probable that the Defendant is guilty than innocent. To warrant a conviction the Defendant must be proved to be guilty so clearly and conclusively that there is no reasonable theory upon which he can be innocent, when all of the evidence in the case is considered together, and if the prosecution has failed to make such proof, the jury should find the defendant not guilty."

Later, when the jury submitted questions to the court and an additional definition of reasonable doubt was sought, the court said:

"As a further definition of reasonable doubt. 'I instruct that you do not have to know that the defendant is guilty before you convict him but in order for you to be warranted in returning a verdict of guilty as charged in the Information, it is only necessary that you believe from all of the evidence beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis that the defendant is guilty.'"

■ Since rape is not a lesser includable offense when the charge is murder, we need not consider the possible effect of the offense of rape merging with the offense of murder, resulting, as some courts have held, in the inapplicability of the felony-murder doctrine. See 40 A.L.R.3d 1341, 1346.

■ Although this court has taken into consideration that the trial court did not include an instruction on lesser includable offenses, and pertinent thereto are Sections 12–27–21, 29–21–06, and 12–06–06, N.D.C.C.,

since the defendant made no request that such an instruction be submitted to the jury, made no objection to the fact that none was submitted to the jury initially, did not object to the oral instruction in which the court informed the members of the jury that they had no alternative other than to find the defendant guilty of murder in the first degree or not guilty, and has not raised as an issue in this court the trial court's failure to so instruct, we shall refrain from including in this opinion a discussion of the effect of this omission on the defendant's request for a new trial. Suffice it to say that we find no prejudicial error from such omission in light of the specific charge and the procedural aspects of this case that would justify a new trial.

■ The defendant contends that the corpus delicti has not been proved in this case. He refers us to a 1917 decision of our court, wherein we said:

"* * * 'corpus delicti,' as understood in homicide cases, means the body of the crime, and consists of two component parts, the first of which is the death of the person alleged to have been killed, and the second that such death was produced through criminal agency." State v. Sogge, 36 N.D. 262, 161 N.W. 1022, 1023 (1917).

■ In *Sogge*, after discussing the history of the doctrine, we said:

"And to-day, in absence of statute, the rule is almost universal that the ingredients of the corpus delicti may be established by circumstantial evidence, provided such evidence is so clear and convincing and of such probative force that it establishes the commission of the crime beyond all reasonable doubt." State v. Sogge, *supra*, 161 N.W. 1022, 1024.

A statute pertinent to this issue is Section 12–27–28, N.D.C.C. It reads:

"Independent facts necessary to prove guilt.—No person can be convicted of murder, manslaughter, nor of aiding sui-

cide, unless the death of the person alleged to have been killed and the fact of the killing by the accused as alleged, are established as independent facts, the former by direct evidence and the latter beyond a reasonable doubt."

It is the defendant's contention that the evidence is not so clear and convincing and of such probative force that it established the commission of the crime beyond all reasonable doubt. He points to Dr. Skarphol's testimony to the effect that his examination revealed a dilation on the right side of the heart and that microscopic examination of the heart showed two small areas of recent heart attack approximately two or four weeks old, to his opinion that the cause of death was asphyxia, that she had a severe disease in her lungs, that she had extensive pneumonia, bronchitis, excessive amounts of fluid present in the air sacs of her lungs, that this would have hindered her ability to get oxygen, and thus that her death was caused by asphyxia. He further refers us to that part of the doctor's testimony which reads:

"I cannot state with absolute certainty that she would not have died with this degree of pneumonia without external factors."

The defendant also objects to the trial court's allowing an answer to the hypothetical question which sought to determine the doctor's opinion as to the effect that fighting or scuffling by a person having pneumonia, bronchitis, and edema of the lungs, would have on the ability of such person's lungs to transmit oxygen to the blood. The objection was based on the contention that there was no evidence in the record of fighting or scuffling.

■ In light of the fact that the evidence disclosed that Mrs. St. Clair had a bruise above her left eye, the presence of the syrup bottle on the floor, the syrup in Mrs. St. Clair's hair, the defendant was found on top of Mrs. St. Clair, who was lying on her back on the floor, and the relative ages and health of the two parties, the question did not assume something unreasonable.

As for Dr. Skarphol's testimony, it must be weighed in light of his other testimony, part of which discloses that he discovered a laceration in the anterior vaginal wall, and in light of the testimony of other witnesses.

Defendant contends that the record is silent as to the resistance of the alleged rape victim and the resistance having been overcome by force and violence of the defendant. He contends that the marks on the body of the decedent, the bruises, abrasions and contusions have not been shown to have been inflicted by the defendant. He admits that there was considerable testimony from which it could be inferred that the defendant inflicted these injuries, but asks where is the proof that the defendant inflicted the injuries.

In support of his contention that the crime was not proved beyond a reasonable doubt, he asks the following questions:

"Was the asphyxiation a result of the numerous respiratory problems of the decedent? Was it caused by her partaking of alcoholic beverages? Was it caused by the excitement of the social activities in the home? Was it caused by natural causes as a result of her apparently long and debilitating illness? Was it caused by the coughing spasm referred to by Dr. Skarphol?"

These were questions that defense counsel could have raised, and perhaps did raise, in argument to the jury and were no doubt questions which the jury considered in arriving at its verdict. They are not questions over which we should exercise our judgment.

As we have said earlier, it is not for us to substitute our judgment for the judgment of the jury. The jury has weighed the evidence, determined the credibility of the witnesses who appeared before it, and rendered its verdict. The evidence supports the verdict, and accordingly the verdict must stand.

The defendant further asserts that inferences cannot be based upon inferences to convict a person. He cites People v. Eaves, 4 Mich.App. 457, 145 N.W.2d 260 (1966), and 5 A.L.R.3d 100 to 163.

In considering *Eaves*, we note that the court of appeals of Michigan commences its consideration of the defendant's contention that the People's case amounted to an inference based upon another inference, which was insufficient to prove that the defendant was guilty of the offense as charged, with a quotation from 5 A.L.R.3d 100 at 104, as follows:

" 'The discussion of the legal effects of presumptions and inferences has evoked perhaps as much cloudy thinking and confusion of terminology as any other area of the law.' " People v. Eaves, *supra*, 145 N.W.2d 260, 263.

The Michigan court quoted with approval from an Indiana decision, in which that court attempted to explain the meaning of the rule that an inference cannot be based upon an inference, as follows:

" 'What is actually meant by the statement found in many cases, that an inference cannot be based upon an inference, is that an inference cannot be based upon evidence which is uncertain or speculative or which raises merely a conjecture or possibility.' " People v. Eaves, *supra*, 145 N.W.2d 260, 263, quoting from Shutt v. State (1954), 233 Ind. 169, 117 N.E.2d 892, 894.

■ Without adopting the inference-upon-inference rule, it is our view that the defendant's rights were protected against the evil intended to be avoided by the rule, by the court's instructions that the jury must find the defendant guilty beyond all reasonable doubt and that when the circumstances are consistent with the hypothesis of the accused's innocence as well as with that of his guilt, the jury must find him innocent. These instructions we have earlier discussed herein.

Section 4 of 5 A.L.R.3d contains recent decisions indicating a trend rejecting the rule that an inference cannot be based upon another inference.

Significant is the text writer's analysis of Wigmore's thinking:

"Professor Wigmore rejects the possibility of the existence of any rule forbidding basing an inference upon an inference, pointing out that all reasoning must proceed upon a series of inferences and saying that the cases putting forth the doctrine must be taken as valid only for the particular evidentiary facts therein ruled upon. See the Treatises on Evidence 3d ed § 41." 5 A.L.R.3d 100, 122.

We next turn to Specifications of Error II and III.

#### "II

"The Court erred in its indiscriminate and unwarranted use of the word 'rape' and various connotations and ramifications thereof throughout its Instructions to the jury.

#### "III

"The Court erred in its answers to certain questions propounded by the jury to the Court during the course of deliberations."

■ Defendant asserts that although the second count contained in the original information was separated so that he was tried only on the first count, charging him with first-degree murder, and that this count did not make reference to the term "rape," the trial court repeatedly used the term "rape" in conjunction with its instructions to the jury. He specifically complains of the reference to "rape" following the submission of the form of the verdict of guilty of the crime of first-degree murder. That part of the instruction reads:

" 'We the jury in the above-entitled action do find the Defendant, Ambrose Collin Champagne, also known as Am-

brose Louis Champagne, guilty of the crime of first degree murder as charged in the Criminal Information.' This is the form of verdict you will use and return if the State has proved to your satisfaction beyond a reasonable doubt that the Defendant did cause the destruction of the life of one Alice St. Clair while committing the act of Rape, and if you further find beyond a reasonable doubt that there was a causal connection between the act of Rape and her death."

He points out that the term "rape" is not used in the criminal information, and in that respect he is correct. The term is not used, but the charge asserts conduct of the defendant which under the circumstances amounts to the crime of rape.

Pertinent is Subsection 3 of Section 12–30–01, N.D.C.C., which reads:

" 'Rape' defined.—Rape is an act of sexual intercourse accomplished with a female not the wife of the perpetrator, under any of the following circumstances:

\* \* \* \* \* \*

"3. When she resists, but her resistance is overcome by force or violence;

\* \* \* \* \* \*

This definition of the crime of rape was included in the instructions.

As the term "rape" described in capsule form what the information charged, the use of the term did not prejudice the defendant.

We likewise see no error in that part of the trial court's instructions which set forth the language of the second form of the jury verdict and followed with a comment relative thereto. That part of the instruction reads:

" 'We the jury in the above-entitled action do find the defendant, Ambrose Collin Champagne, also known as Ambrose Louis Champagne, not guilty of the crime of murder in the first degree as charged in the Information.' This is

the form of verdict you will use and return if you find that the State has failed to prove beyond a reasonable doubt all of the material allegations and essential elements of the crime of first degree murder."

The defendant contends that the questions of the jury foreman show the jury was confused by the court's instructions and particularly by its use of the term "rape".

Pertinent is a part of the record relative to some of the questions asked by the jury foreman.

"We have some doubt among some of the members of the jury as to whether a person, if a person is unable to resist and has an act of sexual intercourse performed on that person, whether it constitutes rape. \* \* \* We are thinking of a person that might be unconscious, that didn't consent or resist. \* \* \*

"The fourth question, if a person with perhaps—were perhaps threatened or consented to sexual intercourse under duress, where they consented rather than resisted physically, physically resisted because they figured the consequences would be worse. I can clarify a little. As I understand that question, if somebody figured they could get into sexual intercourse and have that instead of taking a beating and still have to suffer sexual intercourse. Is that clear? \* \*

"The fifth question is, whether it is possible for us to come to any conclusion other than guilty or not guilty. I am thinking can we find guilty of rape only or murder? Whether there is any other, any alternates other than the two choices we were given."

In response thereto the court commented:

"Now, with regard to question number one, the import of the question, as the court understands, that if a person is unable to resist, for example, being unconscious, can, and she has an act of

intercourse performed upon her, is this or does this constitute rape? Now, the law as to the definition of rape does cover this situation. It covers the situation where she is unconscious and that she does not know that the act is being performed on her. However, under my instructions to you, and this is what you were to go by, rape as it's defined in this case can only take place under the following circumstances; that her resistance was overcome by force or violence. On page four of the instructions which you have you will look at the material allegations of the Information, the third, number three, as I quote, 'That the said Alice St. Clair did resist such intercourse but her resistance was overcome by force or violence.' Also, referring to my original instruction on Page four, I say as follows, 'The rape is defined by the law of this state, as it applies to this case, as an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, when her resistance is overcome by force or violence.' The reason that you must find that her resistance was overcome by force or violence is that the State has chosen in its Information, to allege that this is the way it happened. And therefore, you must limit your inquiry to that allegation as it's contained in the Information.

"And I think, jumping out of order here, it follows along logically, your fourth inquiry that, must a person resist if it's useless, this is the substance of the question, as I understand it. And in that regard, rape can be committed in that manner when the person is prevented from resistance of [by] threats of immediate and great bodily harm accompanied by apparent power of execution. However, once again I emphasize to you, that in this particular case, the only way that you can find that the defendant performed an act of rape upon Alice St. Clair is, if Alice St. Clair's resistance was overcome by force or violence."

In light of the judge's explanation confining the jury to finding rape as it is described in the information, notwithstanding that the court acknowledged that rape could be accomplished under other circumstances, we believe that the jury was properly instructed and in no way misled.

The defendant next discusses in his brief Specifications of Error IV and V, which read:

"IV

"The Court erred in permitting any testimony by Pathologist Daryl P. Skarphol, M.D., the same being totally incompetent.

"V

"The Court erred in refusing to give Defendant's Requested Instruction No. 23."

Here the argument seems to be that the body examined by Dr. Sawchuk shortly after two a. m. on February 26, 1971, was not the same body as that examined by Dr. Skarphol, or if it was the same body that when it was examined by Dr. Skarphol it was not in substantially the same condition as when it was examined by Dr. Sawchuk. No evidence has been submitted by the defendant to prove that the body was not the same body or that it was not in substantially the same condition, but it is the contention of the defendant that when the State failed to establish by testimony how the body was removed from the St. Clair home to the laboratory in Grand Forks, that the State failed in properly proving the corpus delicti.

It is interesting to note that the defendant by his objection prohibited the State from adding names to the criminal information so that those named persons could be called to testify, to properly link the bodies. As it was the defendant's action which prevented the State from calling witnesses to testify relative to this matter, and as a photograph of the body examined by Dr. Skarphol, showing the face and its injury,

which photograph was taken by Dr. Skarphol, was identified by both Officer Jeanotte and Dr. Sawchuk as being of Mrs. St. Clair and truly representing and portraying the condition of her face at the time they examined her in the St. Clair house, we find no prejudicial error in this complaint. Testimony of Dr. Skarphol otherwise was to a greater extent beneficial to the defendant, as he disclosed the existence of diseased heart and lungs, could not relate the facial injury directly with death, and attributed death to asphyxia which could have occurred without external causes.

Defendant's requested Instruction No. 23, which was refused by the court, reads:

"The State may not shift the burden of proof on the defendant so as to require him to prove that the body of Mrs. St. Clair was not properly handled or was tampered with during the 33 hr interval from the time of Dr. Sawchuk's examination until Dr. Skarphol's pathological examination in Grand Forks."

What we have heretofore said relative to this matter applies to the trial court's denial of this instruction.

We next turn to Specifications of Error VI and VII, which read:

"VI

"The Court erred in refusing to give Defendant's Requested Instruction No. 1.

"VII

"The Court erred in refusing to give Defendant's Requested Instruction No. 3."

Defendant's requested Instructions numbered 1 and 3 read:

1.

"You are instructed that in the absence of proof of resistance by the female, consent is presumed. Further, that failure to make outcry, where others are in the vicinity and outcry would be available, should be considered in determining the question of whether she consented to the act."

3.

"You are cautioned that you should not permit prejudice against this defendant to enter your minds, simply because of the heinous nature of the crime charged. The defendant is presumed to be innocent until every material part or element of the crime charged is proved beyond a reasonable doubt, and the nature of the crime is not to be considered in determining whether the evidence establishes such proof."

The defendant contends that the issue of resistance was injected into the case merely by the State through the allegations in the information and that the record is devoid of any proof of resistance or of making any outcry. Here the defendant cites People v. Rich, 237 Mich. 481, 212 N.W. 105 (1927); Commonwealth v. Goldenberg, 338 Mass. 377, 155 N.E.2d 187, 70 A.L.R.2d 814 (1958).

Defendant asserts that without this instruction the jury may have concluded that evidence of resistance was not really very important.

Let us first consider the citations of authority referred to us as supporting the contention that the court erred in failing to give an instruction to the jury to the effect that failure to cry out for help when help is nearby indicates consent to the sexual relations.

In *Rich*, the supreme court of Michigan quoted with approval from 22 R.C.L. 1187:

" 'In prosecutions for rape, the best of judges of ancient and modern times have laid down certain tests by which to be governed in ascertaining the truthfulness of the party preferring the charge. They concur in saying that her evidence should be carefully considered in connection with the circumstances in determining

whether she consented to the act, or whether, as she testifies, it was without her consent. Proof of the failure of the female to make any outcry tends to show that she consented to the intercourse, but, if the transaction occurs at a place so remote from all human help that all outcry must be unavailing, it has been held that outcry need not be made, as the law does not require the doing of impossible or useless acts.'" People v. Rich, 237 Mich. 481, 212 N.W. 105, 108 (1927).

In *Rich*, the defendant was charged with common-law rape. The Michigan supreme court summarized the facts as follows:

"Defendant, a young man 21 years old, and the prosecutrix, Louise King, a young lady student at the Battle Creek College, aged about 19 years, in company with another young couple, Mr. Baker and Miss Reasoner, on the evening of May 25, 1925, drove out to the grounds of the Country Club at Goguac Lake near Battle Creek in defendant's car. When they reached a point in the drive, spoken of in the record as the 'turn around,' defendant and prosecutrix got out of the car. The prosecutrix claims defendant said he wanted to show her where he had made a remarkable shot in golf. Mr. Baker and Miss Reasoner remained in the car. The distance defendant and prosecutrix went from the car is in dispute, defendant fixing it at a short distance and prosecutrix fixing it at from 350 to 500 feet. It is the claim of prosecutrix that defendant attacked her, beat her into insensibility, and accomplished his purpose by force and against her will. Defendant admits the act of intercourse, but insists that it was with the consent of the prosecutrix. It will not be necessary to detail subsequent events that evening, and it will suffice to state that the party returned to Battle Creek, defendant stated to friends of prosecutrix where she was living that she was intoxicated, and some of them accompanied the party in a drive taken for the purpose of resuscitating prosecutrix; she was re-turned to Battle Creek, and during the night medical aid was summoned. The testimony established beyond doubt that from some source prosecutrix had received a most serious injury; her jaw was fractured, and she was semiconscious for many hours." People v. Rich, *supra*, 212 N.W. 105.

In concluding that the trial court erred in not giving an instruction that the jury could consider as an indication of consent that the complainant did not cry out for help when help was nearby, the court summarized six decisions that it found in which similar requests were refused by trial courts. A review of those decisions indicates that none of them involved facts such as we have in the instant case. In each of those cases, the victim lived to complain, but in a number of them the victim did not complain until considerable time had elapsed after the alleged event and did not cry out for help when help was reasonably available.

■ Considering the weakened condition of Mrs. St. Clair from the pneumonia and recent heart attack, her age and diminutive size as compared to the defendant's youth and his size, it is unlikely that she could even have accomplished an audible outcry, and considering further that the others in the house were in such condition that they could not help her, her husband being a bedridden invalid, and the two young men being in a state of drunken stupor, an outcry would have availed her nothing.

In *Rich*, the Michigan court quoted from an earlier Michigan decision as follows:

" 'The refusal to give a request to charge, where there is evidence in the case to support it, is erroneous, unless it is fairly covered by the general charge.' Carrel v. Kalamazoo Cold-Storage Co., 112 Mich. 34, 70 N.W. 323." People v. Rich, *supra*, 212 N.W. 105, 109.

Applying that principle, there being no evidence in the instant case to support the

requested instruction, the trial court did not err in not giving the jury an instruction on outcry.

The other case referred to us by the defendant in support of his contention that an instruction on outcry should have been given is that of Commonwealth v. Goldenberg, 338 Mass. 377, 155 N.E.2d 187 (1959). That case is clearly distinguishable from the instant case on the facts, as that case was based upon a charge of rape committed upon the complainant through fraud.

The victim in that case not only lived through the experience, but failed to cry out for help when help was available in the next room, and further failed to complain about the alleged rape until some days after its occurrence.

We next consider the contention that the trial court erred in failing to give a cautionary charge to the jury.

Cited in support of this contention is Reynolds v. State, 27 Neb. 90, 42 N.W. 903 (1889); 44 Am.Jur. Rape § 122, p. 979.

In *Reynolds*, the supreme court of Nebraska in 1889 held it error for the trial court not to give the following requested instruction:

"'(1) The charge made against the defendant is in its nature a most heinous one, and well calculated to create strong prejudice against the accused, and the attention of the jury is directed to the difficulty, growing out of the nature of the usual circumstances of the crime, in defending against the accusation of rape. So you, the jury, must carefully consider all the evidence in the case, and the law given you by the court in making up your verdict. You must find on the part of the woman not merely a passive policy or equivocal submission to the defendant; such resistance will not do. Voluntary submission by the woman, while she has power to resist, no matter how reluctantly yielded, removes from the act an essential element of the crime of rape. If the carnal knowledge was with the voluntary consent of the woman, no matter how tardily given or how much force had theretofore been employed, it is not rape." Reynolds v. State, *supra*, 42 N.W. 903.

The Nebraska court held the failure to give such a charge reversible error, referring to Lord Hale's concern that courts and juries upon trials of offenses of this nature might with much ease be imposed upon unless they exercise great care and vigilance.

From American Jurisprudence we note the following seemingly conflicting positions:

"On a trial for rape, where the evidence is conflicting as to resistance and force, the trial court should, in its instructions, caution the jury that prejudice is liable to be aroused against the accused because of the heinous nature of the crime charged.

\* \* \* \* \* \*

"The courts are not in harmony in the various jurisdictions in regard to the duty of the court to caution the jury that a charge of rape is easily made and difficult to disprove. A number of courts take the very logical view that the giving of such an instruction rests within the discretion of the court in view of all the evidence in the case. It is recognized that the nature of the evidence may be such as to necessitate the giving or justify the refusal of such an instruction." 44 Am.Jur. Rape §§ 122, 123, p. 979.

Although in the instant case the court did not instruct the jury to be careful to avoid prejudice which might result from the heinous nature of the crime charged, we think that the court protected the defendant by other cautionary advice as follows:

"The fact that an Information has been filed in this Court charging the Defendant with a criminal offense is no evidence whatever, and is not to be considered by you as such. The Information merely states the charge in legal form, upon

which the State has a right to offer evidence in this action, and outlines the issues to be determined by you from the evidence under these instructions. The mere fact that the Defendant was placed under arrest is no evidence whatsoever of his guilt and is not to be considered by you as such.

"The Defendant is presumed to be innocent until the contrary, his guilt, is proved to your satisfaction beyond a reasonable doubt. If you have a reasonable doubt as to whether the guilt of the Defendant has been so proven, he is entitled to be acquitted."

*   *   *   *   *   *

"Mere probabilities are not sufficient to warrant a conviction. Nor is it sufficient that the greater weight or preponderance of the evidence support the allegations of the Information, nor is it sufficient that on the doctrine of chance it is more probable that the Defendant is guilty than innocent. To warrant a conviction the Defendant must be proved to be guilty so clearly and conclusively that there is no reasonable theory upon which he can be innocent, when all of the evidence in the case is considered together, and if the prosecution has failed to make such proof, the jury should find the defendant not guilty."

*   *   *   *   *   *

"If the evidence in this case will admit of two constructions or interpretations, each of which appears to you to be reasonable, one of which points to the guilt of the Defendant and the other to his innocence, you must adopt the interpretation which will admit of the defendant's innocence and reject that which points to his guilt.

"This rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of two possible conclusions appears to you to be reasonable and the other to be unreasonable, you must adhere to the reasonable deduction and reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to the Defendant's guilt, you must otherwise be satisfied of the Defendant's guilt beyond a reasonable doubt before you can find the Defendant guilty."

*   *   *   *   *   *

"While a criminal offense may be proved by circumstantial evidence, the facts and circumstances in evidence should be consistent with each other and with the guilt of the Defendant, and inconsistent with any reasonable theory of the Defendant's innocence."

*   *   *   *   *   *

"You should carefully consider and weigh all of the evidence. ' You must not allow sympathy, prejudice or public opinion to sway you in your deliberations. Take this case and do justice between the State of North Dakota and the Defendant, Ambrose Collin Champagne."

In light of the foregoing cautionary instructions, we find no error in the trial court's failure to draw attention to the heinous nature of the crime charged and possible prejudice resulting therefrom.

We turn now to consideration of Specification of Error No. 8 which is that the court erred in refusing to give defendant's requested Instruction No. 21 for an advised verdict of acquittal, in denying defendant's motion for an advised verdict of acquittal, and in denying defendant's motion that the court direct the jury to reconsider its verdict pursuant to Section 29–22–27, N.D.C.C.

The defendant points out that following receipt of the verdict of guilty, counsel for the defendant moved, pursuant to Section 29–22–27, N.D.C.C., for a reconsideration of the verdict by the jury. Section 29–22–27, N.D.C.C., reads:

"Reconsideration of verdict of guilty— None of acquittal.—When there is a verdict of conviction in which it appears to the court that the jurors have mistaken the law, the court may explain the reason

for that opinion and may direct the jurors to reconsider their verdict. If, after the reconsideration, they return the same verdict, it must be entered. When there is a verdict of acquittal, the court cannot require the jurors to reconsider it."

This specification of error merely reiterates contentions made in the other specifications of error which we have previously discussed herein and found to be without merit. As this specification of error raises no new issues, but merely restates old ones, we shall not discuss it further.

Specification of Error No. 9 asserts that the court erred in giving the jury as a supplemental instruction a version of the so-called *"Allen* charge" after the foreman of the jury had reported that the jury was hopelessly deadlocked.

The defendant points out that the jury in this case retired to commence its deliberations at 2:05 p. m. on June 12, 1971; at 5:25 p. m. on that date, the court announced that approximately five minutes prior thereto the court had received a request that the jury wished to consult with the court; after six questions were propounded to the court, the jury left the court room at 5:36 p. m., and at 6:10 p. m. on that date, the jury returned to the court room for the court's answers; at 6:26 p. m., the court recessed; at midnight the clerk received a message from the jury that the jury was hopelessly deadlocked; and at 12:05 a. m., June 13, 1971, the jury returned to the court room, at which time the court read the instruction to the jury, which has been condemned as an *Allen-*type instruction. It reads:

"I am going to read you another instruction from the court, ladies and gentlemen of the court, ladies and gentlemen of the jury, and I would like your attention in this matter. A large proportion of cases in which questions of fact are decided by the verdict of a jury, and in perhaps, all cases, absolute certainty cannot be obtained or expected.

The verdict to which you agree, must of course, be your own verdict, the result of your own convictions and not a mere acquiescence in the opinions of your fellow jurors. Yet in order to bring twelve minds to a unanimous result you must examine the questions submitted to you with candor and proper regard and indifference to the opinions of each juror. You should consider that you are selected in the same manner and from the same source from which any future jury must be that would try this case. There is no reason to suppose that this case will ever be submitted to twelve men and women more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other at another trial. With this view, it is your duty to decide the case if you can conscientiously do so.

"You should consult again with one another and deliberate to reaching agreement if you can do so without doing violence to your individual judgments. You must each decide the case for yourselves, but you should do so only after a full consideration of the evidence with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. However, you should not be influenced to vote in any way, on any questions submitted to you, by reason of the single facts that a majority of the jurors, or any of them favor such a result. In other words, you should not surrender your honest convictions concerning the effect or weight of evidence for the mere purpose of returning a verdict or solely because of opinion of the other jurors.

"You should reason together and talk over the existing difference together, if any, harmonize them, if possible, and examine such differences in a spirit of fairness and open-mindedness. You should lay aside all pride of judgment and give careful judgment and view of your fellow jurors, may have to present upon the testimony in this case. I will reread.

You should lay aside all pride of judgment and give careful consideration to the view of your fellow jurors, that what we—let me look at this. You should lay aside all pride of judgment and give careful consideration to the view your fellow jurors may have to present upon the testimony in the case. You should listen with a disposition to be convinced to each other's arguments bearing in mind that it should be the object of all of you to arrive at a common conclusion. To that end you should deliberate together with calmness and without stubborn adherence to any position once taken. Each of you should consider, from the fact that you are in apparent disagreement, the correctness of each other's conclusions and ask yourself whether they are reasonable. In the light of the foregoing I shall ask you to retire once more to deliberate further and make at least one more conscientious effort to reach a verdict."

Following that instruction, the jury was released to report back to the jury room. The record does not show the time that the jury was released. At 1:15 a. m. on June 13, 1971, the jury returned with a verdict finding the defendant guilty of the crime of murder as charged in the criminal information. The jury was polled, with each of the jurors voting in the affirmative for the verdict.

The defense points out that attributing ten minutes for preliminaries, for reading the charge, and for the jury to retire to the jury room, there remained only one hour for the jury to deliberate following the *Allen* charge.

The defendant asserts that although the *Allen*-type charge has been approved in Lathrop v. Fargo-Moorehead St. Ry. Co., 23 N.D. 246, 136 N.W. 88 (1912); Borstad v. LaRoque, 98 N.W.2d 16 (N.D.1959); and Benzmiller v. Swanson, 117 N.W.2d 281 (N.D.1962), in *Benzmiller* this court reiterated what it had said in *Borstad,* that:

" * * * trial courts should scrupulously avoid any statement or suggestion

which would induce the jurors to conciliate arbitrarily or coerce them into returning a verdict at the cost of any juror's surrendering his honest convictions." Benzmiller v. Swanson, *supra,* 117 N.W.2d 281, 289.

Defendant further asserts that although the *Allen*-type charge has been approved in civil cases in North Dakota, there has been no criminal case in North Dakota in which such a charge has been approved.

The defendant contends that in the instant case, in addition to the inherently coercive nature of the supplemental instructions, there are two factors which stand out in particular. First, the court directed the jury that: "You should consult again with one another and deliberate to reaching agreement if you can do so without doing violence to your individual judgment." Second, the jury after some ten hours of deliberations, five and one-half of which came after the last instructions on questions of law, reported itself to be "hopelessly deadlocked" and then only one hour after receiving the supplemental *"Allen*-type" charge, came in with a verdict of guilty.

It is the defendant's contention that under these circumstances it is very probable that the jury took the quoted portion of the instruction to mean that they were to deliberate until they reached agreement and that the jury's quick decision thereafter indicates that the jury was coerced into arriving at a verdict.

As disclosed to us by a case cited by the defendant, the supreme court of Oregon in 1971 stated that the *Allen* charge, often called the "dynamite" charge, is a supplemental instruction given to encourage deadlocked jurors to reach agreement. That decision discloses that the first reported case of such an instruction was an 1851 Massachusetts case, but that the name of the charge arises out of Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896). We quote from the Oregon decision.

"The central idea of the instruction is that although no juror is expected to yield a conscientiously held opinion, the jury has a duty to decide the case if it can conscientiously do so and that if a majority of the jury is for either conviction or acquittal, the minority ought to consider whether a contrary view may be reasonable and correct.

"In recent years the 'Allen charge' has been the subject of considerable discussion, including increasing criticism upon the ground that it is improperly coercive."  State v. Marsh, 490 P.2d 491, 494 (Or.1971).

■  Without discussing the many variations of the *Allen* charge discussed in *Marsh*, we think it significant to refer to one of the decisions referred to therein, that being a 1966 opinion of the United States Court of Appeals for the District of Columbia, written by then Circuit Judge Burger, wherein that court sustained an *Allen* charge with slight variations.  We quote:

"The *Allen* charge has faced frequent attack, but the Supreme Court by implication recently reinforced its approval of the charge; it rejected an appeal challenging a Court of Appeals acceptance of the charge with the notation that it found no error in this claim.  All Courts of Appeals faced with the issue have affirmed the charge, and this Court has recently upheld its use in Moore v. United States, 120 U.S.App.D.C. 203, 345 F.2d 97 (1965). See Copes v. United States, 120 U.S.App. D.C. 234, 345 F.2d 723 (1964); Cf. Mullin v. United States, 123 U.S.App.D.C. 29, 356 F.2d 368, 370 (1966).

"We have been presented with no arguments that lead us to alter our view that the *Allen* charge is a carefully balanced method of reminding jurors of their elementary obligations, which they can lose sight of during protracted deliberations. It is perfectly valid to remind them that they should give some thought to the views of others and should reconsider their position in light of those views.

The charge as given here did not *require* the jury to reach a verdict but only reminded them of their duty to attempt an accommodation.  While it suggests to the minority that they reconsider their position in light of a majority having a different view, it reminds them that they should not acquiesce in a verdict which does not represent their own convictions." Fulwood v. United States, 125 U.S.App. D.C. 183, 369 F.2d 960, 961, 962 (1966).

As in *Fulwood*, we have examined the so-called *Allen* charge given in this case and find that although it varies in some respects from the original *Allen* charge, in that the original *Allen* charge asked the minority to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority, and the charge in the instant case does not make specific reference to the minority only, we think that the variation is immaterial.

That the charge in the instant case did not single out the minority makes it a more acceptable instruction than the original *Allen* charge.  See Commentary, Standards Relating to Trial by Jury, Advisory Committee on the Criminal Trial, American Bar Association Project on Standards for Criminal Justice (New York: Institute of Judicial Administration, 1968), Section 5.4(a), p. 146.

■  In light of the recent development, we would recommend for future use by trial judges Section 5.4, Standards Relating to Trial by Jury, *supra*.  See especially Section 5.4(b).

"5.4  Length of deliberations; deadlocked jury.

"(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

"(i) that in order to return a verdict, each juror must agree thereto;

"(ii) that jurors have a duty to consult with one another and to deliberate with

a view to reaching an agreement, if it can be done without violence to individual judgment;

"(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

"(iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

"(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

"(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

"(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement."

Standards Relating to Trial by Jury, *supra*, pp. 145–146.

We draw attention specifically to the following part of the Commentary:

"Because the instruction contemplated in section 5.4(a) is to be given prior to the time the jury has retired (and thus prior to the time a minority has been established to exist), and because it makes no reference to the minority but instead charges all jurors to consult with one another, the proposed instruction does not have the coercive impact of the *Allen* charge. See Burroughs v. United States, 365 F.2d 431 (10th Cir. 1966), recommending the practice provided for in sec-

tion 5.4(a)." Standards Relating to Trial by Jury, *supra*, Commentary, p. 147.

The original *Allen* charge was explained by the Supreme Court in its opinion in 1896 as follows:

"The seventeenth and eighteenth assignments were taken to instructions given to the jury after the main charge was delivered, and when the jury had returned to the court, apparently for further instructions. These instructions were quite lengthy, and were, in substance, that in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority." Allen v. United States, *supra*, 164 U.S. 492, 501, 17 S.Ct. 154, 157.

Having compared the original *Allen* charge with the charge that was given in this case, and having considered it in light of recent developments in the state courts as indicated by the supreme court of Oregon in *Marsh*, we conclude that the modified *Allen* charge in the instant case did not constitute prejudicial error to the defendant. As previously stated herein, however, we recommend for future use Sec-

tion 5.4, Standards Relating to Trial by Jury, *supra.*

Having considered all of the specifications of error of the defendant, and having found them each insufficient to justify a reversal of the verdict or the judgment based thereon, and also having considered them in their cumulative effect, we conclude that there is no justification for a new trial. Accordingly, the verdict and judgment are affirmed.

Notwithstanding this conclusion, in light of the evidence and the fact that had the jury been given an instruction which permitted them to bring in a verdict of a lesser includable offense of the crime of murder in the first degree (including a verdict of murder in the second degree, manslaughter in the first degree, and manslaughter in the second degree), the jury may have returned a lesser verdict, we recommend that the Pardon Board give early consideration to an application for commutation of the life sentence to a term of years certain so that parole may be considered at an earlier date than otherwise possible.

In State v. Whiteman, 79 N.W.2d 528 (N.D.1956), in which the defendant was charged with having committed the same offense charged in this case, the trial court refused to give an instruction to the effect that the jury was required to find only one of two verdicts, i. e., guilty of murder in the first degree or not guilty. After the court had instructed the jury that they could return verdicts of lesser offenses than that charged in the information, and after the court defined those lesser offenses, the jury returned a verdict of guilty of manslaughter in the first degree. Upon appeal, the defendant contended that this instruction was error. This court, after referring to Sections 12–2721, 29–2106, and 12–0606, N.D.R.C. of 1943, and encyclopedia law, held that the trial court acted properly in giving the instruction on lesser includable offenses.

In the interests of justice, we make the recommendations stated herein.

STRUTZ, C. J., and PAULSON and KNUDSON, JJ., concur.

TEIGEN, Judge (dissenting).

I concur in the holding that the verdict and judgment be affirmed. However, I cannot agree with the majority's recommendation to the Pardon Board and I dissent from that portion of the majority opinion. The addition of the paragraph recommending that the Pardon Board give early consideration to an application for a commutation of the life sentence to a term of years so that parole may be considered at an earlier date is, in my opinion, a tacit confession by the majority that the evidence does not establish guilt of murder in the first degree beyond a reasonable doubt, although they have held otherwise earlier in the opinion. If this is so, the majority should have reversed the verdict and judgment and granted a new trial.

I am of the opinion that this Court should not attempt to influence the decision of the Pardon Board on matters entirely within its jurisdiction. It is not for this Court to assume a paternal position to the Pardon Board. The Pardon Board of North Dakota is a constitutional body and a part of the executive branch of government. It is perfectly able, I think, to make its own decisions without aid of this Court. The decision of the Pardon Board, for good reasons or bad, or for any reason at all, is final and irrevocable and the courts have no concern with the reason which actuates it. This power is beyond the control, or even the legitimate criticism, of the judiciary. The decision of the Pardon Board is not reviewable by the court and any attempt to interfere is a manifest usurpation of authority. 59 Am.Jur.2d Pardon and Parole § 43.

It is also my conclusion that the majority have exceeded the jurisdiction of this Court by giving an advisory opinion which is contrary to our constitutional powers.